**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Oscar McMURRAY, a/k/a Osama
Omar, Defendant–Appellant.**

**United States of America,
Plaintiff–Appellee,**

v.

**Stephanie LOMAX, a/k/a Hamedah
Hasan, a/k/a Stephanie McMurray,
Defendant–Appellant.**

**United States of America,
Plaintiff–Appellee,**

v.

**Tracy N. LOMAX, a/k/a Ahad Hasan,
Defendant–Appellant.**

**Nos. 93–3694, 93–3695 and 93–3748.**

United States Court of Appeals,
Eighth Circuit.

Submitted May 9, 1994.

Decided Sept. 14, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied Oct. 19, 1994 in Nos. 93–3964 and 93–3748.

Rehearing and Suggestion for Rehearing En Banc Denied Oct. 24, 1994 in No. 93–3695.

Stuart J. Dornan, Omaha, NE, argued, for Oscar McMurray.

Susan Koenig–Cramer, Omaha, NE, argued, for Stephanie Lomax.

Sandra Lee Dougherty, Omaha, NE, argued, for Tracy Lomax.

Michael G. Heavican, Omaha, NE, argued (Marie R. Leslie and Daniel A. Morris, on the brief), for appellee.

Before MAGILL, Circuit Judge, JOHN R. GIBSON, Senior Circuit Judge, and BOGUE,* Senior District Judge.

JOHN R. GIBSON, Senior Circuit Judge.

A jury found appellants Oscar McMurray (a/k/a Osama Omar), Tracy Lomax (a/k/a Ahad Hasan), and Stephanie Lomax (a/k/a Hamedah Hasan, a/k/a Stephanie McMurray) guilty of several counts of drug-related offenses, including conspiring to distribute cocaine powder and cocaine base ("crack").[1] All three appeal their convictions and sentences. We affirm.

At trial, the government sought to show that Oscar McMurray, Tracy Lomax, and Stephanie Lomax[2] participated in a conspiracy to distribute cocaine base in the Omaha, Nebraska area. A total of twenty-eight government witnesses testified, including police officers, experts, coconspirators and cooperating witnesses. The evidence at trial showed that Tracy Lomax, McMurray and a third person were arrested at the New Tower Inn in Omaha in 1988. The officers found approximately fourteen grams of crack, drug paraphernalia, Western Union money-wire transfer receipts, and a gun. Almost exactly one year later, officers arrested Tracy Lomax at the Omaha airport, where he had been met by Stephanie Lomax and two other women. The police searched Tracy Lomax's luggage and found a scale with cocaine residue and a gun. Numerous witnesses testified about their business and personal dealings with all three appellants from 1988 to 1991. This testimony generally established that the appellants, and the various persons working with or for them, had actively purchased cocaine powder, converted it into cocaine base, and distributed it in the Omaha area. Documentary evidence established that appellants and their associates made over 150 wire transfers between 1988 and 1991, totalling over $180,000 for which they had little, if any, lawful explanation. Following the jury's conviction on all counts, the

---

* The Honorable Andrew W. Bogue, Senior United States District Judge for the District of South Dakota, sitting by designation.

1. On October 22, 1992, a ten-count Superseding Indictment was filed in the District of Nebraska charging Oscar McMurray, Tracy Lomax, Amber Allen, Floyd L. Russell, and Stephanie Lomax in Count I with conspiracy to distribute and possess with intent to distribute 500 grams or more of cocaine or 50 grams or more of cocaine base, between April 1, 1988, and November 30, 1991, in violation of 21 U.S.C. §§ 846 and 841(a)(1). Count II charged Tracy Lomax with distribution of cocaine base between April 1, 1989, and August 31, 1989. Count III charged Oscar McMurray and Tracy Lomax with distribution of cocaine base between October 4, 1988, and October 11, 1988. Count IV charged Stephanie Lomax with distribution of cocaine during August 1990. Count V charged Stephanie Lomax with unlawful distribution of cocaine between September 1, 1990 and December 31, 1990. Count VI charged Tracy Lomax with distribution of cocaine and cocaine base between January 1, 1991, and May 24, 1991. Count VII charged Floyd L. Russell with distribution of cocaine base between March 1, 1991, and November 7, 1991.

Count VIII charged Troy Brooks with distribution of cocaine on May 24, 1991, in furtherance of the conspiracy charged in Count I. Count IX charged Troy Brooks with interstate travel in aid of a racketeering enterprise, i.e., distribution of cocaine, between May 15 and May 25, 1991, in violation of 18 U.S.C. § 1952(a)(3), and in furtherance of the conspiracy charged in Count I. Finally, Count X charged Tracy Lomax with use of a telephone to distribute cocaine in violation of 21 U.S.C. § 843(b).

Each of the substantive counts contained allegations against some of the defendants, asserting that the crimes were committed in furtherance of the conspiracy alleged in Count I. See Pinkerton v. United States, 328 U.S. 640, 647–48, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489 (1946). The jury found the appellants guilty on all of the charged counts.

Other named participants in the conspiracy either pled guilty or were not prosecuted on the federal charges in exchange for cooperating with the government.

2. Subsequent to their indictment, each appellant adopted a Muslim name. We will refer to them by the names in the indictment.

district court[3] sentenced Tracy Lomax and Stephanie Lomax to life imprisonment. Departing downward from the sentencing guidelines due to McMurray's diminished capacity, the court sentenced McMurray to 120 months in prison.

The appellants challenge their convictions and sentences on numerous grounds. First, they argue the district court erred in refusing to suppress certain evidence, including some coconspirator conversations, the evidence obtained from the search of Tracy Lomax at the Omaha airport, and the searches of the motel rooms at the New Tower Inn. Second, Stephanie Lomax contends that insufficient evidence exists to support her conviction. Third, the appellants challenge the district court's sentencing, contending: (1) the sentencing guidelines' 100:1 ratio for cocaine base sentencing violates the Equal Protection Clause; (2) the court erred in determining it could not depart downward; (3) the court erred in treating powder cocaine as cocaine base in determining the proper sentences; (4) the court incorrectly calculated the amount of drugs involved in the conspiracy; and (5) the court improperly enhanced Stephanie Lomax's and Tracy Lomax's sentences based, respectively, on Stephanie's role in the offense and Tracy's possession of a firearm.

## I.

■ Oscar McMurray[4] contends that the district court clearly erred in denying his motion to suppress evidence relating to the drugs, drug paraphernalia and gun found when officers searched him and the two motel rooms at the New Tower Inn. He argues that the officers unlawfully arrested him outside the motel and then illegally searched him and the rooms without a warrant. When a court denies a motion to suppress, we review its factfinding under a clearly erroneous standard. *United States v. Bieri,* 21 F.3d 811, 814 (8th Cir.1994); *United States v. McKines,* 933 F.2d 1412, 1426 (8th Cir.) (en banc), *cert. denied,* —— U.S. ——, 112 S.Ct. 593, 116 L.Ed.2d 617 (1991). The ultimate

application of the law to these facts is reviewed de novo. *Id.*

In October 1988, employees at the New Tower Inn notified the Omaha Police Department that occupants of two rooms at the motel met several aspects of a drug trafficker hotel/motel profile that law enforcement officers had distributed in April of that same year. The profile had proven highly successful, leading to the confiscation of cocaine or cocaine base in all eight reports investigated since April. Sergeant Mark Langan began an investigation which included discussions with the motel employees. He found that the occupants of rooms 1074 and 1210 met several profile characteristics: They came from suspected drug source cities for Omaha (Oakland, California, and Portland, Oregon); checked in on the same day; paid cash, renewing their rooms one day at a time; refused maid service; and received numerous incoming calls (including many from Portland). Moreover, the occupant of 1074, McMurray, had requested a cab to take him to an area which contained a local housing project that was known as a gang area with "open-air" crack dealing. Finally, Langan learned that the occupants of rooms 1074 and 1210 had substantial contact with each other.

Langan obtained the assistance of four other officers to conduct a brief surveillance of the rooms. After the officers determined that room 1074 was occupied, Langan approached the room. Sergeant Steven Novotny and Officer Eric Buske stationed themselves at the back door of the room. Langan knocked, and Tracy Lomax voluntarily let him into the room. Meanwhile, McMurray fled through the back door, but was met by Novotny and Buske who were each holding a drawn gun. The officers identified themselves and ordered McMurray back into the room. When McMurray complied, the officers re-holstered their guns and stepped into the room with him.

The officers then asked McMurray to place his hands on the motel-room wall. He complied, and Novotny conducted a pat-down search. This search disclosed a bag of co-

---

**3.** The Honorable Richard G. Kopf, United States District Judge for the District of Nebraska.

**4.** Tracy Lomax's brief before this court incorporates McMurray's argument by reference.

caine base wrapped around a one by four-inch lead magnet. Novotny testified that prior to removing the magnet from McMurray's pocket, Novotny believed it was a gun or a knife. The officers then arrested and handcuffed McMurray. The officers' continued search of McMurray yielded a room key to room 1210 and some money. Meanwhile, Tracy Lomax and another occupant granted the officers permission to search room 1074. The officers found Western Union receipts, cocaine, marijuana, and a test tube with cocaine residue. McMurray then granted the officers permission to search room 1210, and directed them to the location of a gun in the room. Later, at the police station, McMurray also produced a bag of cocaine base which he had kept in his underwear.

Contrary to the decision of an earlier state trial court, the magistrate judge[5] recommended that the court admit the evidence obtained from the searches of McMurray and the New Tower Inn rooms. The magistrate judge found:

> [T]he officers ... had sufficient facts from the reports received from hotel management and their experience with drugs and firearms being brought into the Omaha area from source cities during the spring and summer months of 1988 reasonably to assume that criminal activity was afoot.... [T]he officers' actions in stopping defendant McMurray when he attempted to leave the hotel room and subjecting him to a pat down search were reasonable steps taken to insure the safety of the officers and to maintain the status quo. For these reasons, I will recommend that the initial search of defendant McMurray and the evidence obtained therefrom not be suppressed.

*United States v. McMurray,* Report and Recommendation, No. 8:CR92–00012, slip op. at 15–16 (D.Neb. Feb. 18, 1993). The district court adopted the report and admitted the evidence over McMurray's objection.

■ We are convinced that sufficient facts exist to support the court's finding that the officers had a reasonable articulable suspi-

cion that criminal activity was afoot. The characteristics contained in the drug trafficking profile, McMurray's trip to an area known for "open-air" crack dealing and his quick exit by way of the back door following Langan's knock, all give rise to a reasonable suspicion that drug dealing was occurring. Thus, the officers were entitled to stop McMurray outside the motel. *Terry v. Ohio,* 392 U.S. 1, 28, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968); *see United States v. Poitier,* 818 F.2d 679, 683 (8th Cir.1987) (drug courier profile characteristics and untruthful answers provided sufficient basis for *Terry* stop), *cert. denied,* 484 U.S. 1006, 108 S.Ct. 700, 98 L.Ed.2d 651 (1988); *see United States v. Cortez,* 449 U.S. 411, 418, 421, 101 S.Ct. 690, 695, 696–97, 66 L.Ed.2d 621 (1981) (court must consider the totality of the circumstances, including inferences based on officers' past experiences).

■ Having lawfully stopped McMurray, Novotny properly conducted "a reasonable search for weapons for the protection of the police officer, [because] he ha[d] reason to believe that he [was] dealing with an armed and dangerous individual." *Terry,* 392 U.S. at 27, 88 S.Ct. at 1883. The officers' reasonable suspicion that McMurray was dealing drugs provides an adequate basis for them to reasonably believe he might be armed and dangerous, because "weapons and violence are frequently associated with drug transactions." *United States v. Brown,* 913 F.2d 570, 572 (8th Cir.1990). Thus, the search of McMurray's person for weapons was permissible, and the court properly admitted the drugs found wrapped around the lead magnet.

■ McMurray contends that even if the officers conducted a valid *Terry* stop, drawing their guns and ordering him back into the motel room exceeded the bounds of a lawful search incident to a *Terry* stop and transformed the incident into an arrest. As this court has recognized, officers conducting a valid investigative detention may draw their weapons in situations involving poten-

---

**5.** The Honorable Kathleen A. Januzemis, United States Magistrate Judge for the District of Nebraska.

tial danger to the officers. *See United States v. Danielson,* 728 F.2d 1143, 1147 (8th Cir.) (officers drawing of guns while approaching car containing robbery suspect did not exceed permitted bounds of an investigative stop), *cert. denied,* 469 U.S. 919, 105 S.Ct. 300, 83 L.Ed.2d 235 (1984). The applicable test is whether the officer's conduct was "reasonably necessary to protect [his] personal safety and to maintain the status quo so that the limited purposes of the stop may be achieved." *United States v. Raino,* 980 F.2d 1148, 1149 (8th Cir.1992) (quoting *United States v. Hensley,* 469 U.S. 221, 235, 105 S.Ct. 675, 683–84, 83 L.Ed.2d 604 (1985)), *cert. denied,* —— U.S. ——, 113 S.Ct. 1662, 123 L.Ed.2d 280 (1993). The district court's finding that the officer's suspicion of drug dealing raised sufficient security concerns to justify the drawing of their guns is not clearly erroneous. Similarly, the mere fact that the officers requested McMurray to step inside the motel room before they frisked him and questioned him does not transform the investigative stop into an arrest. *See United States v. Vanichromanee,* 742 F.2d 340, 344–45 (7th Cir.1984); *United States v. Oates,* 560 F.2d 45, 57–58 (2d Cir.1977). The officers testified that they asked McMurray to return to the room for security reasons such as better lighting. This explanation coupled with the very limited distance and time period involved provides ample basis for the district court's conclusion that the officers had not arrested McMurray, and probable cause was not required. *Raino,* 980 F.2d at 1149 (partial blocking of suspect's car and officers' approaching with drawn guns held not an arrest where reasonable under the circumstances).

▇ Finally, McMurray contends that the district court was bound by an earlier state court decision suppressing the fruits of the search. This court has held that a federal district court may refuse to follow a state court's suppression decision. *See United States v. McConnell,* 903 F.2d 566, 570–71 (8th Cir.1990), *cert. denied,* 499 U.S. 938, 111 S.Ct. 1393, 113 L.Ed.2d 449 (1991) (citing *Rinaldi v. United States,* 434 U.S. 22, 98

S.Ct. 81, 54 L.Ed.2d 207 (1977)) (administration of criminal justice would suffer if Constitution required one sovereign to accept findings of another sovereign solely because one was the first to prosecute). As discussed above, the district court properly found the searches lawful, and it did not err in admitting the evidence obtained.

## II.

▇ Tracy Lomax argues that the district court made several errors in admitting evidence. We review a district court's decision to admit evidence over a party's objection under the abuse of discretion standard. *United States v. Johnson,* 28 F.3d 1487, 1497–98 (8th Cir.1994). If a party fails to properly object to the admission of the evidence, we will reverse only for plain error. *United States v. Davis,* 785 F.2d 610, 618 (8th Cir.1986). Tracy Lomax contends the district court erred in admitting evidence obtained during his 1989 arrest at the Omaha airport. Various officers testified to finding, among other things, a gun and a digital scale with cocaine residue in Tracy Lomax's luggage. The district court admitted the testimony, despite Lomax's motion in limine and his objections at trial. Tracy Lomax argues the evidence is inadmissible as a "prior bad act." *See* Fed.R.Evid. 404(b).[6] The government contends that Tracy Lomax's arrest was introduced not as a mere instance of a past bad act, but instead, as evidence in support of the overall conspiracy.

A very similar situation existed in *United States v. Stephenson,* 924 F.2d 753 (8th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 321, 116 L.Ed.2d 262 (1991), where we considered the admissibility of evidence obtained from one conspiracy or arrest during the time period covered by the charged conspiracy. *Id.* at 762. We upheld the admission of the evidence, stating that "evidence which is probative of a crime with which a defendant is charged, and not *solely* of some other uncharged crimes, is not evidence of 'other bad acts.'" *Id.* (quoting *United States v. Westbrook,* 896 F.2d 330, 334 (8th Cir.1990)) (emphasis in original); *McConnell,* 903 F.2d at

6. Rule 404(b) provides in relevant part that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith."

571. Tracy Lomax's arrival in Omaha with a scale with cocaine residue, as well as Stephanie Lomax's presence at the airport to meet Tracy Lomax, were part of the government's proof that the appellants were engaged in a conspiracy to distribute cocaine. Although this evidence might not be sufficient to draw any particular conclusions about the scope of the conspiracy, it does lend direct support to the government's case. The district court concluded that this evidence was probative of the crimes charged, and we conclude it did not err in doing so.

■ Tracy Lomax next argues that the district court erred in admitting at trial the testimony of coconspirators and several law enforcement officers. He contends that the coconspirators' statements were not made in furtherance of a conspiracy, and are therefore hearsay. The government counters that the statements were admissible because they were: (1) not hearsay; or (2) fall under Fed.R.Evid. 801(d)(2)(E). This Rule states that a statement is not hearsay if it is "offered against a party and is ... by a coconspirator of a party during the course and in furtherance of the conspiracy." It is well established that Rule 801(d) is to be construed broadly in favor of admissibility. *United States v. Mayberry*, 896 F.2d 1117, 1121 (8th Cir.1990).

Tracy Lomax specifically contests the court's admission of Officer Sanchelli's testimony about statements Troy Brooks made to him after Sanchelli arrested Brooks at the Omaha airport. After the police arrested Brooks for possessing cocaine and marijuana, Brooks told the police he was supposed to deliver the cocaine to "Lee," who was later identified as Floyd Russell. Brooks agreed to cooperate with authorities by telephoning Russell, telling Russell he had been arrested, but that the cocaine was still in his luggage and should be picked up from the airport. Police recorded the telephone conversations between Brooks and Russell, and the government introduced the transcripts and recordings at trial. The district court also conditionally admitted Sanchelli's testimony about Brooks provided that the government could later prove that the statements were made in furtherance of the conspiracy.

■ Tracy Lomax argues that Sanchelli's testimony recounting Brooks' statements after his arrest and during the recorded telephone conversation with Russell was inadmissible hearsay because Brooks was in custody and thus not acting "in furtherance" of the conspiracy. The government argues that Sanchelli's testimony was not hearsay because it was not offered for the truth of the matter asserted, but "for the reason of Sanchelli's actions." Further, the government argues that Sanchelli's testimony was offered under the coconspirator exception contained in Rule 801(d)(2)(E).

We cannot conclude that the district court abused its discretion when it admitted Sanchelli's testimony. The government did not offer the conversation for the truth of what Brooks and Russell were saying to each other, but to explain why Brooks placed the call to Russell. Moreover, the district court did not abuse its discretion in admitting Russell's statements during the recorded telephone conversations. Because Russell had not yet been arrested, any statements he made were "in furtherance" of the conspiracy within Rule 801(d)(2)(E).

### III.

■ Stephanie Lomax contends that insufficient evidence exists to support her conviction. In determining whether a jury's verdict is supported by sufficient evidence, this court considers "the evidence in the light most favorable to the verdict, accepting as established all reasonable inferences tending to support the verdict." *United States v. Lyon*, 959 F.2d 701, 705 (8th Cir.1992) (citing *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942)). The verdict will be upheld if a reasonable-minded jury could find guilt beyond a reasonable doubt, even if the evidence does not exclude all other possibilities. *United States v. Galvan*, 961 F.2d 738, 740–41 (8th Cir.1992).

■ Stephanie Lomax does not contest that a conspiracy to distribute cocaine base existed. Instead, she argues that the evidence failed to link her to the conspiracy. As we have held on numerous occasions, once the existence of a conspiracy is established,

slight evidence connecting a defendant to the conspiracy is sufficient to support a conviction. *United States v. Agofsky*, 20 F.3d 866, 870–71 (8th Cir.1994); *United States v. Foote*, 898 F.2d 659, 663 (8th Cir.), *cert. denied*, 498 U.S. 838, 111 S.Ct. 112, 112 L.Ed.2d 81 (1990).

■ The government introduced ample evidence linking Stephanie Lomax to the conspiracy. Clifford Thomas testified that he had purchased four to five kilograms of cocaine and cocaine base from Tracy Lomax while Stephanie Lomax was present. Although he initially purchased from Tracy Lomax, Thomas testified that he later bought cocaine directly from Stephanie Lomax. Further, although Tracy Lomax handled most of Thomas' transactions, Stephanie Lomax completed at least two of the sales (involving approximately one and one-half kilos of cocaine base) herself. Similarly, Brooks testified that he had retrieved and delivered cocaine at Stephanie Lomax's direction. Jacqueline Fleming testified as to Stephanie Lomax's role in transporting cocaine from California to Omaha. Finally, expert testimony showed that Stephanie Lomax used a number of aliases to transfer money via Western Union wire transfers. We are convinced that this evidence provides sufficient basis for the jury's conclusion that Stephanie Lomax participated in the charged conspiracy.

## IV.

### A.

The appellants raise several arguments concerning their sentences. The district court sentenced McMurray to 120 months imprisonment, and Stephanie and Tracy Lomax to life imprisonment.[7]

First, the appellants challenge the constitutionality of 21 U.S.C. § 841, which provides penalties for the distribution of cocaine base, and United States Sentencing Commission, *Guidelines Manual* § 2D1.1 (Nov.1993), which provides the guideline sentences for offenses involving the distribution of drugs.

■ Specifically, appellants argue section 841 and guideline section 2D1.1, which impose harsher penalties by a 100:1 ratio upon defendants convicted of offenses involving cocaine base ("crack") as opposed to powder cocaine, discriminate on the basis of race and violate the Equal Protection Clause of the Constitution. According to the appellants, black offenders committing offenses involving cocaine base receive substantially longer sentences than white offenders committing offenses involving powder cocaine. They emphasize that a substantial majority of defendants prosecuted for offenses involving cocaine base are African–Americans. Alleging that the applicable statutes and guidelines have a disproportionate adverse effect on a racial minority which can be traced to a discriminatory congressional purpose, appellants ask us to adopt a strict scrutiny analysis to review the relevant statutes and sentencing guidelines.

We review questions involving the constitutionality of statutes de novo. *United States v. Buckner*, 894 F.2d 975, 978 (8th Cir.1990). We need not engage in a detailed discussion of the appellants' constitutional challenge because we recently in *United States v. Clary*, 34 F.3d 709, 714 (8th Cir. 1994), rejected an argument that the 100:1 ratio violates the equal protection clause. *See Johnson*, 28 F.3d at 1493–94 (rejecting inference that Congress or the Sentencing Commission acted with a discriminatory purpose in enacting section 841 or guideline section 2D1.1); *United States v. Maxwell*, 25 F.3d 1389, 1396–97 (8th Cir.1994) (rejecting an equal protection challenge to the crack penalties of the sentencing guidelines).

### B.

The appellants next argue that the district court erred in determining it could not depart downward pursuant to 18 U.S.C. § 3553(b) in imposing their sentences. 18 U.S.C. Section 3553(b) requires a court to impose a sentence within the guideline range "unless the court finds that there exists an

---

7. Each appellant received a separate sentence to run concurrently for each count on which they were found guilty. Each received at least two sentences in the maximums we indicated above.

aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described."

Appellants argue that Congress and the Sentencing Commission relied on "inaccurate and inadequate" information which led to the adoption of harsher penalties by a 100:1 ratio for offenses involving cocaine base. They contend that these increased penalties have a disparate adverse impact on the sentences of African–Americans because black males usually deal cocaine base while white males tend to deal in powdered cocaine. Finally, they urge that the disparate impact on African–Americans is the kind of circumstance the Sentencing Commission did not consider, and thus, the district court erred in concluding it did not have authority to depart from the guidelines.

■■■ We have on numerous occasions held that claims of error on failing to depart downward are not reviewable. *Johnson*, 28 F.3d at 1500; *United States v. Evidente*, 894 F.2d 1000, 1004 & n. 5 (8th Cir.) (failure-to-depart claims based on circumstances the Sentencing Commission did not adequately consider are not reviewable), *cert. denied*, 495 U.S. 922, 110 S.Ct. 1956, 109 L.Ed.2d 318 (1990); *see Maxwell*, 25 F.3d at 1400–01 (reversing district court's departure based on disparate racial impact and concluding that Sentencing Commission's failure to consider the disparate impact of the 100:1 ratio is not a ground for downward departure).

### C.

McMurray also contends that the district court erred in treating the powder cocaine he was convicted of distributing as cocaine base for the purpose of determining his sentence. After recognizing that the transaction at issue involved only powder cocaine, the court stated:

It is clear that the powder was intended for conversion to "crack" since it is undisputed that McMurray knew [Tracy Lomax] sold "crack." The fact that the powder

was seized before it was converted to crack is not significant.

*United States v. McMurray*, 833 F.Supp. 1454, 1476 n. 31 (D.Neb.1993). The court further stated that it converted the amount of powder cocaine to cocaine base for the purpose of determining McMurray's sentence because it did "not think the seizure of the powder cocaine 'reflect[s] the scale of the offense' unless the powder is treated as 'crack.'" *Id.* (quoting U.S.S.G. § 2D1.1, cmt. n. 12).

■■■ The Sentencing guidelines use a determination of the quantity and identity of the controlled substance attributed to the defendant to establish a base offense level. *See* U.S.S.G. § 2D1.1. "The government must establish by a preponderance of the evidence both the type and amount of drug attributable to each defendant." *Maxwell*, 25 F.3d at 1397. We review the district court's determination of the quantity of drugs for clear error, and will reverse only if we are left with a firm and definite conviction that a mistake has been made. *United States v. Adipietro*, 983 F.2d 1468, 1472 (8th Cir.1993). A sentencing court may consider any evidence as long as it has sufficient indicia of reliability to support its probable accuracy. *Id.*; *United States v. Sales*, 25 F.3d 709, 711 (8th Cir.1994).

■■■ Recently, in *United States v. Maxwell*, this court held that the district court did not clearly err in calculating the quantity of drugs as cocaine base rather than powder cocaine because "that was the form in which the cocaine was finally distributed to persons outside of the conspiracy." 25 F.3d at 1397. Similarly, there was ample evidence that the coconspirators in this case, including McMurray, distributed cocaine base rather than powder cocaine. For example, authorities seized drug paraphernalia used to convert powder cocaine to cocaine base, and several witnesses testified about the coconspirators' cocaine base sales. Accordingly, we conclude the district court did not clearly err in holding McMurray accountable for cocaine base rather than powder cocaine. *See United States v. Haynes*, 881 F.2d 586, 592 (8th Cir.1989) (converting amount of powder cocaine into crack for purposes of sentencing

because evidence showed defendant was "in the business of selling crack cocaine and not powder cocaine").

### D.

Tracy Lomax argues the court incorrectly calculated the amount of drugs attributable to him as 12.6 kilograms of crack cocaine, and erred in assessing his base offense level as 40.[8] He contends the court clearly erred in accepting the calculations of the probation officer who drafted the presentence report, claiming the report was compiled and based on unreliable testimony.

■ The district court did not clearly err in its drug quantity determination. We need not itemize each piece of evidence and testimony which supports the calculation in the presentence report. Numerous government witnesses, all of whom the district court found credible, testified about transactions involving large quantities of cocaine or cocaine base over a period of several months. Indeed, the district court stated it probably underestimated the quantities involved. For example, Clifford Thomas and Carl Johnson each testified about purchasing amounts ranging from nine-ounce packages to one-kilogram packages on regular occasions over several months. Cynthia Gamble testified that she purchased "rocks" of crack, which a government witness testified each weigh approximately one pound. These three witnesses testified to quantities well over the five-kilogram threshold for assigning a base offense level of 40. Further, Western Union receipts showing wire transfers totalling $180,000 were seized from the coconspirators. These wire transfer receipts support an inference of substantial drug dealing. *See United States v. Greene*, 22 F.3d 838, 839 (8th Cir.1994) (per curiam). In light of this evidence, and the district court's cautious estimates of the quantities involved, we easily conclude the court did not clearly err in calculating the quantity of drugs attributable to Tracy Lomax.

### E.

Finally, Stephanie Lomax and Tracy Lomax argue the court improperly enhanced their respective sentences. Stephanie Lomax contends that the court erred in enhancing her sentence three levels for the role she played in the offense, arguing that she was not a manager or supervisor in the conspiracy. *See* U.S.S.G. § 3B1.1(b). Tracy Lomax contends the court erred in enhancing his sentence two levels for possession of a firearm during the commission of a drug offense. *See* U.S.S.G. § 2D1.1(b)(1).

■ The sentencing guidelines provide for a three-level enhancement to the base offense level if the defendant "was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(b). We review the district court's factual determination of a participant's role in an offense under the clearly erroneous standard. *Maxwell*, 25 F.3d at 1399.

■ As we stated in our discussion of the sufficiency of the evidence showing Stephanie Lomax's participation in the conspiracy, there was ample testimony from which the district court could have found that Stephanie Lomax was a manager or supervisor in the conspiracy. For example, there was testimony that Stephanie Lomax: handled transactions for Tracy Lomax, directed and paid Troy Brooks to retrieve crack from some bushes near a residence, orchestrated the shipments of the cocaine from California to Omaha, sewed cocaine into a stuffed animal before flying from Fresno, California, to Omaha to deliver the cocaine, and made numerous Western Union wire transfers involving large sums of money. In light of this evidence, we cannot conclude that the district court clearly erred in determining that Stephanie Lomax was a "manager or supervisor" and enhancing her sentence three levels.

Tracy Lomax argues that the district court clearly erred in enhancing his sentence two levels for possession of a firearm in connection with a drug offense. *See* U.S.S.G.

8. Under U.S.S.G. § 2D1.1(a)(3) and (c)(2), a base offense level of 40 is assigned if the cocaine base involved in the conspiracy is greater than five kilograms, but less than fifteen kilograms.

§ 2D1.1(b)(1). When Tracy Lomax was arrested at the Omaha airport on October 25, 1989, a search of his luggage revealed a .25 caliber gun and a digital scale containing cocaine residue. Tracy Lomax argues the government failed to prove a connection between the gun and the conspiracy.

We review the district court's factual finding that a defendant possessed a firearm during the commission of a drug offense under the clearly erroneous standard. *Maxwell,* 25 F.3d at 1399. The government must prove by a preponderance of evidence a connection between the gun and the criminal activity, as mere possession of a firearm is not sufficient to trigger the enhancement. *United States v. Khang,* 904 F.2d 1219, 1223 (8th Cir.1990). The two-level enhancement is proper unless it is clearly improbable that the weapon was connected to the offense. *Maxwell,* 25 F.3d at 1399. In light of the undisputed evidence that the gun was found near drug paraphernalia, we conclude that the district court did not clearly err in finding that the government met its burden of establishing a relationship between the gun and the conspiracy. *See United States v. Lucht,* 18 F.3d 541, 555 (8th Cir.1994) (district court did not clearly err in finding sufficient nexus between drugs and firearm to support two-level enhancement where handgun was found near drugs and triple-beam scale); *United States v. Nash,* 929 F.2d 356, 358 (8th Cir.1991) (district court did not clearly err in enhancing sentence when gun was found in luggage near drug paraphernalia).

For the foregoing reasons, we affirm the convictions and sentences of Oscar McMurray, Tracy Lomax and Stephanie Lomax.