# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

———————

No. 97-3206

———————

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff-Appellee, | * | |
| | * | |
| v. | * | Appeals from the United States |
| | * | District Court for the |
| James Michael Dugan, | * | District of Minnesota |
| | * | |
| Defendant-Appellant.. | * | |

———————

Nos. 97-3522, 97-4328

———————

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff-Appellee, | * | |
| | * | |
| v. | * | |
| | * | |
| Larry Leonard Thompson, | * | |
| | * | |
| Defendant-Appellant. | * | |

———————

Submitted: May 15, 1998
Filed:     July 24, 1998

———————

Before McMILLIAN, NOONAN[1], and MORRIS SHEPPARD ARNOLD, Circuit
    Judges

_____

NOONAN, Circuit Judge.


Larry Leonard Thompson and James Michael Dugan appeal their convictions of

three counts of mail fraud in violation of 18 U.S.C. §§ 1341 and 2, eight counts of

wire fraud in violation of 18 U.S.C. §§ 1343 and 2, and two counts of interstate

transportation in violation of 18 U.S.C. §§ 2314 and 2.


## FACTS

In the summer of 1994 Thompson formed an organization he called GAILS, an

acronym for Go American International Listing Services.  Its announced purpose was

to facilitate imports into and exports from the United States.  Its members were to

solicit manufacturers in this country to use GAILS to market their products abroad at

a fee of $25,000.  Thompson and Dugan recruited the members, informing them that

GAILS already had a "global network of over 1,200 established trade

---

[1]The Honorable John T. Noonan, Jr., United States Circuit Judge, United States
Court of Appeals for the Ninth Circuit, sitting by designation.

agents."  The members were asked to pay the organization a total of $25,000 for territorial rights to represent GAILS and to pay $2,500 "fully refundable" as an initial fee to GAILS.  Thompson and Dugan ran advertisements in newspapers around the country seeking members and informing potential members that they could make yearly incomes of as much as $200,000.  GAILS was said by them to have its international headquarters on Old Bond Street, London, England and its national headquarters in the World Trade Center in New York City.  Each of the defendants stated that the agents were known to them and in place.  Each of the defendants stated that they had previous  success in international marketing, and Thompson, in particular, referred to his success in marketing concrete docks, the so-called "Rock Dock" scheme.

In the first six months of marketing Dugan placed ads and did telemarketing from Florida where he was in a halfway house serving time for his previous federal conviction in 1988 of mail fraud in connection with the Rock Dock.  In February 1995 he came to Minneapolis where Thompson had been directing the operation and, in March 1995 he participated in a conference discussing what they should do as Thompson was being returned to prison for violation of his probation in connection with the Rock Dock.  They agreed that members or potential members would be told that Thompson was going to Europe and Australia to visit the agents.

Dugan, when he was in Florida, had explained his presence there to potential members by saying it was a "free trade zone," without mentioning his confinement in the halfway house.

No network of 1,200 agents existed. No headquarters in London or New York existed. No manufacturers were ever persuaded to invest with GAILS. No member had a chance of earning money honestly from the scheme. No money paid by members was refunded. GAILS was an out and out scam run by two men who not only had practiced a similar scam in marketing the oxymoronic Rock Dock but had actually been incarcerated because of their earlier fraudulent venture.


## PROCEEDINGS

On July 2, 1996 the two defendants were indicted along with Teo Stephan Leonard. Leonard subsequently pleaded guilty and became a witness against Thompson and Dugan. The indictment set out the scheme to defraud and then in specific counts charged Thompson and Dugan with "aiding and abetting each other" in specific acts of fraud directed against named individuals.

Prior to trial the government gave notice of its intent to present evidence of the Rock Dock scheme and its consequences as evidence "inextricably intertwined" with the crimes for which the defendants were on trial and as Fed. R. Evid. 404(b)

evidence. The district court ruled in the government's favor.

Thompson sought to introduce a tape recording, lasting 40 minutes, of the March meeting that discussed the action to be taken when he returned to prison. Thompson, Dugan and five others had participated at this meeting. Dugan and the government objected to admitting the whole recording on the grounds that much of it was hearsay. Thompson did not identify specific passages that should be admitted. The district court sustained the objections.

At the government's request the court gave "a willful blindness" instruction as to Dugan, who had not testified at trial and whose defense essentially had been lack of guilty knowledge of Thompson's scheme, at least prior to Dugan's coming to Minnesota.

During its deliberations the jury sent a note asking the judge to define "agent" and "network." The court ruled that the jury did not need the definitions.

The trial began on January 22, 1997 and ended on February 10, 1997 when the jury found them guilty on all counts. Thompson was sentenced to four years imprisonment and to payment of restitution in the amount of $321,455. Dugan was sentenced to 2½ years in prison and the payment of $75,000 in restitution. The restitution obligations were made joint and several.

## ANALYSIS

Both Thompson and Dugan attack the ruling on the admission of the Rock Dock evidence. As to Thompson, since he mentioned the Rock Dock scheme in his promotion of GAILS, it was proper for the government to show that Rock Dock had in fact been a criminal enterprise. It was equally appropriate to explain Thompson's absence from the last phase of GAILS by his re-incarceration to serve out the rest of his Rock Dock sentence. As to Dugan, the Rock Dock conviction explained why he was confined to a halfway house in Florida and so was relevant in establishing that fact in contradiction of Dugan's lying explanation as to why he was in Florida. As to both defendants, the evidence of the Rock Dock criminal scheme was similar in pattern to the one in which they were embarked. It was admissible evidence to establish their fraudulent intent. United States v. Williams, 95 F.3d 723, 730-31 (8th Cir. 1996), cert. denied, 117 S. Ct. 750 (1997).

Dugan objects that the willful blindness instruction was inappropriate, but makes no showing to this effect. Dugan's main defense was that he was not aware of what Thompson was up to. It was proper for the jury to be told that that was no defense if he wilfully closed his eyes to his confederate's misrepresentations. United States v. Gonzales, 90 F.3d 1363, 1371 (8th Cir. 1996).

Dugan challenges the sufficiency of the evidence against him. He was

indicted as both a principal and an abettor. As to counts 3, 4, 8, 9, 10, 11, and 12, the evidence showed Dugan making false statements designed to induce the victim to invest; his liability as a principal was established. As to counts 1, 2, 5, 6, 7, and 13, Dugan's activity in placing advertisements and managing recruitments for GAILS was sufficient to establish his liability as an abettor of Thompson's fraud.

The defendants' contention that the court should have defined agent and network is not persuasive. The words are familiar American words. No special knowledge was required for the jury to appreciate their meaning. See United States v. Shyres, 898 F.2d 647, 653-54 (8th Cir.), cert. denied, 498 U.S. 821 (1990). Similarly, the district court did not abuse its discretion in refusing to permit the playing of the entire recording of the March 1995 meeting. See United States v. Woolbright, 831 F.2d 1390, 1395 (8th Cir. 1987).

Thompson alleges that the government misled the grand jury. The allegations are not well supported. In any event, the verdict of the petit jury makes any error in the grand jury proceeding connected with the charging decision "harmless beyond a reasonable doubt." United States v. Mechanik, 475 U.S. 66, 70 (1986).

The defendants challenge the orders of restitution on the grounds that the district court did not make findings on their ability to pay. If the sentencing had been under the Mandatory Victims Restitution Act of 1996, 18 U.S.C.

§ 3663A(c)(1)(A)(ii), the district court would have been under an absolute duty to order restitution when sentencing for mail fraud. This statute was not referred to by the district court, nor is it referred to by the government on appeal. We have noted that an order of restitution under the statute "is punishment for Ex Post Facto Clause purposes." United States v. Williams, 128 F.3d 1239, 1241 (8th Cir. 1997). The Act became effective April 24, 1996. Thompson's and Dugan's crimes occurred before this date so the statute is not applicable to them.

The district court considered the objections raised by Thompson and Dugan regarding their ability to pay restitution. However, in ordering restitution under Section 3663 as it existed prior to the Mandatory Victims Restitution Act, the district court was required to "make . . . a finding" on their ability to pay "before ordering restitution." United States v. Van Brocklin, 115 F.3d 587, 602 (8th Cir. 1997). The district court made no such findings. However, because neither Thompson nor Dugan objected to the lack of specific findings on their ability to pay, this Court reviews the restitution order for plain error. See United States v. Riebold, 135 F.3d 1226, 1231-32 (8th Cir. 1998). The district court did not plainly err in its restitution orders. It considered each man's financial situation, reducing Dugan's restitution order almost $250,000 below the level proposed by the Probation Office and fining neither man. The restitution ordered, while heavy, was not improper.

The convictions and sentences of the defendants are **AFFIRMED**.

A true copy.

Attest:

CLERK,  U.S. COURT OF APPEALS,  EIGHTH CIRCUIT