# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-1263

_____

United States of America,

              Appellee,

v.

Kermit Kingsley Hall,

              Appellant.

\*
\*
\*
\*
\*   Appeal from the United States
\*   District Court for the
\*   Eastern District of Missouri.
\*
\*
\*

_____

Submitted: December 15, 2009
Filed: May 4, 2010

_____

Before RILEY,[1] Chief Judge, WOLLMAN and MELLOY, Circuit Judges.

_____

RILEY, Chief Judge.

A jury found Kermit Kingsley Hall, a/k/a King Hall, guilty of one count of mail fraud and two counts of wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343, respectively. The district court[2] sentenced Hall to 59 months imprisonment. Hall appeals his convictions and sentence, arguing the district court (1) committed an

---

[1]The Honorable William Jay Riley became Chief Judge of the United States Court of Appeals for the Eighth Circuit on April 1, 2010.

[2]The Honorable E. Richard Webber, United States District Judge for the Eastern District of Missouri.

evidentiary error at his trial, and (2) miscalculated his advisory United States Sentencing Guidelines (U.S.S.G. or Guidelines) range. We affirm.

## I. BACKGROUND

### A. Hall's Fraudulent Scheme Originates in Texas

In February 2003, Hall asked his real estate agent, Heidi Jenkins, to register two trusts, the Kingsley Trust and the Axiom Trust, in Texas. Jenkins registered the two trusts on the same date, at the same courthouse, and with the same business address. Jenkins also opened a bank account for the Axiom Trust at Hall's request. Hall hired Jenkins to serve as the Axiom Trust's trustee, and Jenkins had authority to sign for deposits and withdrawals on the bank account.

Hall began soliciting investors for the Axiom Trust, which Hall falsely trumpeted as a large repository for real estate assets. Hall invited potential investors to purchase $75,000 units of beneficial interest in the Axiom Trust. Hall reasoned that, if Warren Buffett was "charging $75,000 per share for his stock, [Hall] could offer [shares for] that amount." Hall told prospective investors the face value of the Axiom Trust's shares was guaranteed and the shares would earn high rates of interest. Hall bragged no one had ever lost money investing with him.

In the coming years, Hall repeatedly misrepresented himself to potential investors as a wealthy and highly successful real estate investor. Hall bragged he knew Jack Nicklaus and investment bankers at Bear Stearns.[3] Hall claimed or implied he built or negotiated to help buy or build golf courses, churches, the New York Jets' new stadium, the Bellagio Casino in Las Vegas, and properties all along the Hurricane Katrina-ravaged Gulf Coast. Hall also boasted about his experience as a former CIA assassin.

---

[3]Law enforcement officers arrested Hall before the Bear Stearns financial collapse.

Hall convinced J.B., T.J., and others to invest in the Axiom Trust.[4] J.B. traded Hall a 10,080 square foot chateau for twenty-seven shares. J.B. was eager to sell the home because his eldest son had recently died and it was painful for his family to continue to live there. T.J. gave Hall $65,000 in exchange for one share. T.J. was trying to help find investors to help him build a church, and Hall told T.J. he would be willing to build the church if T.J. helped Hall "free up funds" to send to someone in France.

Hall frittered away all of the Axiom Trust's assets. He purchased fancy cars and golf lessons, hired personal attorneys, and lived a grand lifestyle. Hall lavished gifts on his wife, son, and girlfriend.

T.J. asked Hall many times to return his money. Hall repeatedly rebuffed T.J.'s efforts over the course of four years. In 2006, Hall finally admitted to T.J. that the Axiom Trust "had gone away" but said Hall "would be able to transfer [T.J.'s] investment in some way that [T.J.] would get paid [as much as $125,000] through [the] Kingsley Trust." Hall referred T.J. to the Kingsley Trust's website, which T.J. later viewed.

### B.     Hall Moves His Scheme to Missouri

In January 2006, Hall met Joseph Cooper, a certified public accountant in the St. Louis, Missouri, area. Hall touted the Kingsley Trust to Cooper, representing the assets of the Kingsley Trust would be invested with a reputable firm in Chicago and insured by Bear Stearns for eventual investment in the currency exchange market. With the promise of a $300,000 annual salary, Hall hired Cooper to serve as the Kingsley Trust's accountant and later as trustee.

---

[4]We refer to Hall's victims by initials to respect their privacy.

-3-

At Hall's direction, Cooper and David Jarman, a local financial advisor whom Hall had appointed as a trustee of the Kingsley Trust, opened bank accounts in the St. Louis area for the Kingsley Trust. Cooper and Jarman became the accounts' signatories, but Hall controlled the funds.

Hall hired Jarman to develop a website for the Kingsley Trust. Hall drafted and controlled the website's content, and Jarman focused on the website's layout. The Kingsley Trust's website promoted, "[G]uaranteed deposits that post annual rates twice the norm" and "Kingsley Trust erases the guesswork with 'principal guarantee.'" The website contained a form onto which visitors could submit their contact information to learn more about investing in the Kingsley Trust.

C.O. invested in the Kingsley Trust after Hall promised to help build a church. Hall represented himself to C.O. as a wealthy investor in golf courses and alerted C.O. to the Kingsley Trust's website. C.O. found the website, entered his contact information, and began to correspond with Cooper about investing in the Kingsley Trust. In reliance upon a series of false and fraudulent misrepresentations Cooper made to C.O. at Hall's behest, C.O. wired $250,000 to the Kingsley Trust in two separate installments in December 2006.

S.E., J.K., and I.M. also invested in the Kingsley Trust. S.E., an unemployed truck driver, invested $10,000. J.K., a retired schoolteacher and one of Jarman's clients, invested $10,000. I.M., a recent widow and a client of one of Jarman's associates, invested $75,000. Jarman's associate recommended the Kingsley Trust to I.M. after she spoke with Hall, viewed the Kingsley Trust's website, and came to believe all investments were "guaranteed."

As with the Axiom Trust, Hall misappropriated the Kingsley Trust's assets instead of investing them. Cooper directly helped Hall perpetuate the fraud, but

-4-

Jarman did not. When Jarman discovered Hall was not investing the Kingsley Trust's assets, Jarman alerted J.K., I.M., and Jarman's associate.

With Jarman's help, J.K. asked Hall to return her investment, as permitted under the terms of her share in the Kingsley Trust. Cooper then sent J.K. a letter stating he would return her money in 30 days. However, J.K.'s funds were not returned until shortly before trial.

### C.     The Fallout

Jarman contacted the Federal Bureau of Investigation (FBI), and an investigation ensued. During an interview with an FBI agent, Hall denied any wrongdoing and blamed Cooper.

In November 2007, a grand jury returned a three-count indictment against Hall.[5] Count I charged Hall with mail fraud, in violation of 18 U.S.C. §§ 1341 and 2, for sending J.K. the lulling letter. Counts II and III charged Hall with wire fraud, each in violation of 18 U.S.C. §§ 1343 and 2, for inducing C.O. to transfer $250,000 into the Kingsley Trust's bank accounts. Hall pled not guilty.

The FBI agent re-interviewed Hall. Hall admitted he used false promises and guarantees to solicit investment in the Kingsley Trust. Hall said he spent the Kingsley Trust's assets instead of investing them. Hall also admitted similar conduct with respect to the Axiom Trust, although he suggested some of the Axiom Trust's assets were invested in "Humate."[6]

---

[5]Cooper was charged in all three counts of the indictment. Cooper pled guilty to Count I pursuant to a plea agreement and testified at Hall's trial. Shortly thereafter, the district court sentenced Cooper to "time served."

[6]Hall stated Humate is "basically dinosaur dung, for lack of a better term, that's used for fertilizer or for taking the smell out of cat litter."

In October 2008, after a four-day trial, a jury found Hall guilty as charged. At sentencing, the district court calculated Hall's Guidelines range to be 57 to 71 months imprisonment, based in part on a two-level enhancement for mass marketing under § 2B1.1(b)(2)(A). The district court sentenced Hall to 59 months imprisonment and ordered him to pay over $525,000 in restitution to C.O., S.E., and others.

## II.    DISCUSSION

Hall argues the district court erred in (1) admitting evidence regarding the Axiom Trust at trial; and (2) in calculating Hall's Guidelines range, assessing a two-level upward adjustment under U.S.S.G. § 2B1.1(b)(2)(A)(ii) because the offense "was committed through mass-marketing."

### A.    Axiom Trust Evidence

The district court permitted the government to introduce evidence of Hall's involvement in the Axiom Trust notwithstanding the fact that the charged crimes only concerned the Kingsley Trust. The district court held Hall's actions with respect to the two trusts were inextricably intertwined, and thus evidence of the Axiom Trust was intrinsic to the allegations in the indictment.[7]

Hall maintains the Axiom and Kingsley Trusts were not inextricably intertwined. Hall emphasizes the Axiom and Kingsley Trusts were separated in time, place, and parties. Hall stresses (1) "activity in Axiom Trust ended in early 2004 and activity in the Kingsley Trust beg[a]n in May 2006"; (2) the Axiom Trust was located in Texas, and the Kingsley Trust was located in Missouri; (3) the Axiom and Kingsley Trusts had different victims; and (4) Cooper was not involved in the Axiom Trust.

---

[7]In the alternative, the district court considered the Axiom Trust evidence also was admissible under Fed. R. Evid. 404(b). Cf. United States v. Dugan, 150 F.3d 865, 867 (8th Cir. 1998) (holding evidence of prior fraud scheme was "similar in pattern to the one in which [the defendants] were embarked" and thus "was admissible to establish their fraudulent intent"). We do not reach this issue.

"We have consistently held 'crimes or acts which are "inextricably intertwined" with the charged crime are not extrinsic and Rule 404(b) does not apply.'" United States v. Clarke, 564 F.3d 949, 957 (8th Cir. 2009) (quoting United States v. Aldridge, 561 F.3d 759, 766 (8th Cir. 2009)).  Evidence of other crimes or acts is inextricably intertwined if it is "an integral part of the immediate context of the crime charged." United States v. Rolett, 151 F.3d 787, 791 (8th Cir. 1998).  We review the district court's decision to admit the evidence of the Axiom Trust as intrinsic evidence for an abuse of discretion.  See United States v. O'Dell, 204 F.3d 829, 833 (8th Cir. 2000) (citing United States v. McMurray, 34 F.3d 1405, 1411 (8th Cir. 1994)).

The Axiom and Kingsley Trusts were inextricably intertwined, and evidence of the Axiom Trust was intrinsic to the indictment.  See Clarke, 564 F.3d at 957. Jenkins registered the two trusts at the same time, at the same place, and with the same business address.  Hall operated the Axiom and Kingsley Trusts in the same manner. Hall (1) made similar false representations to victims of each trust; (2) kept his own name off the trusts' bank accounts and other important documents; (3) controlled the trusts through conduits; and (4) spent investors' funds on personal expenses—without investing a dime.  While Hall may have shifted his focus from the Axiom Trust to the Kingsley Trust around 2006, in reality the two trusts were integral parts of the same fraudulent scheme Hall created in 2003.  See Rolett, 151 F.3d at 791.  Hall lured T.J. into his scheme via the Axiom Trust and then lulled T.J. into inaction with the Kingsley Trust, directly linking the two trusts.  Cf. United States v. Freeman, 434 F.3d 369, 374 (5th Cir. 2005) (holding the district court did not abuse its discretion in admitting evidence of a second fraudulent scheme, in part, because funds from one scheme were used to lull investors into another scheme).

Failure to introduce evidence of the Axiom Trust might have created a gap in the jury's understanding.  The Axiom Trust evidence explained why the Kingsley Trust lay dormant from 2003 to 2006, and why Hall moved the Kingsley Trust's operations to Missouri in 2006.  In short, once Hall had deceived enough investors in

Texas with the Axiom Trust, Hall inferentially needed to rename the scheme and move to another location. Cf. United States v. McGuire, 45 F.3d 1177, 1188 (8th Cir. 1995) (determining evidence of prior robberies was intrinsic in part because it "explain[ed] the circumstances of" the charged murder conspiracy); United States v. Holmes, 822 F.2d 802, 805-06 (8th Cir. 1987) (reasoning that evidence regarding legality of incarceration was intrinsic to charged escape in part because lack of such evidence "might have created a gap in the jury's understanding of [the defendant's] continued custody"). The Axiom Trust evidence was relevant to show Hall intended to defraud the Kingsley Trust's investors, because the Axiom Trust evidence proved Hall was already hundreds of thousands of dollars "in the hole" to the Axiom Trust's investors when he was promising the Kingsley Trust's investors guaranteed principal and high rates of return.[8] The district court did not abuse its discretion in admitting the Axiom Trust evidence.

Any hypothetical error in admitting evidence of the Axiom Trust would be harmless. The evidence against Hall was overwhelming: (1) Hall admitted his conduct to an FBI agent after he was indicted; (2) it is undisputed Hall spent some of his investors' funds to sustain his lavish lifestyle; and (3) there is no evidence Hall invested any of the Kingsley Trust's funds. Cf. United States v. Jongewaard, 567 F.3d 336, 343 (8th Cir. 2009) (concluding any error would be harmless in light of overwhelming and undisputed evidence of the defendant's guilt), cert. denied, 2010 WL 596615 (U.S. Feb. 22, 2009) (No. 09-6832); O'Dell, 204 F.3d at 834 (recognizing the strength of the government's case minimizes prejudicial effect of intrinsic evidence).

---

[8]The Axiom Trust evidence was relevant under Fed. R. Evid. 401, and that relevance was not substantially outweighed by any unfair prejudicial effect. See Fed. R. Evid. 403. Cf. United States v. Sudeen, 434 F.3d 384, 389 (5th Cir. 2005) (indicating Fed. R. Evid. 403 "should *generally* not be used to exclude intrinsic evidence, because intrinsic inculpatory evidence is by its very nature prejudicial").

**B.    Mass-Marketing Enhancement**

In calculating Hall's Guidelines range, the district court assessed a two-level enhancement under U.S.S.G. § 2B1.1(b)(2)(A)(ii) because, by means of the Kingsley Trust's website, Hall "committed [his fraud] through mass-marketing." The commentary to the Guidelines defines "mass-marketing" to include fraudulent schemes "conducted through solicitation by . . . the Internet . . . to induce a large number of persons to . . . invest for financial profit." U.S.S.G. § 2B1.1, cmt. n.4(A). We review the district court's legal construction of the mass-marketing enhancement de novo but review its underlying factual findings for clear error. See United States v. Williams, 590 F.3d 616, 618 (8th Cir. 2010) (citing United States v. Cordy, 560 F.3d 808, 817 (8th Cir. 2009)).

Hall argues the district court erred in applying the mass-marketing enhancement because his victims would have "invested" in the Kingsley Trust notwithstanding its website. Hall maintains he did not *commit* any fraud *through mass marketing* because it was his force of personality and connections with a trusted local accountant, financial advisors, and others—not the Kingsley Trust's website—that convinced his victims to part with their money. Hall also proposes the record contains little evidence his victims visited the website.

Even if we assume the Kingsley Trust's website did not convince any of Hall's victims to invest and was not widely viewed, the district court nonetheless did not err in applying the mass-marketing enhancement. In amending § 2B1.1, the United States Sentencing Commission stated it intends the mass-marketing enhancement "to apply in cases in which mass-marketing has been used to target a large number of persons, regardless of the number of persons who have sustained an actual loss or injury." U.S.S.G. app. C, amend. 617 (Supp. 2003). The fact that few people fell into Hall's virtual trap has little relevance for amended § 2B1.1 so long as Hall attempted to use the Kingsley Trust's website to solicit funds from a large number of persons. Cf. United States v. Heckel, 570 F.3d 791, 794-95 (7th Cir. 2009) (holding the limited

number of actual victims did not prevent use of the mass-marketing enhancement when the defendant used internet auction sites in a wire fraud scheme). The § 2B1.1(b)(2)(A)(ii) enhancement applies regardless of whether, in a hypothetical world, Hall could have successfully solicited his victims employing the more traditional arts of persuasion. Cf. United States v. Kossak, 178 F. App'x 183, 187 (3d Cir. 2006) (deciding the mass-marketing enhancement applied even though the majority of victims were "referred by friends, family members, or attorneys" because "[t]he fact the [majority of victims] were solicited by other means does not make the enhancement inapplicable"); United States v. Olshan, 371 F.3d 1296, 1300 (11th Cir. 2004) (proposing "[n]othing . . . suggests that [the mass-marketing enhancement] is not applicable to mass mailings to a subgroup of the public composed of the defendant's existing client base"). The mere fact Hall operated a website devoted to the solicitation of investments in his fraudulent scheme is sufficient. See, e.g., United States v. Christiansen, 594 F.3d 571, 576 (7th Cir. 2010) (upholding enhancement under § 2B1.1(b)(2)(A) and stating, "the fact that Christiansen posted an online advertisement that was open to the public shows that she designed her scheme to induce a large number of victims"); United States v. Pirello, 255 F.3d 728, 731 (9th Cir. 2001) (resolving the district court did not err in applying an enhancement under § 2B1.1(b)(2)(A)(ii) for mass-marketing, because "by placing a classified ad on the Internet, Pirello was able to solicit funds instantaneously and continuously from over 200 million individuals worldwide"). Hall does not dispute on appeal that the Kingsley Trust's website was fully accessible to millions of persons worldwide via the Internet.[9]

---

[9] The district court applied the enhancement despite Hall's oral protestations at his sentencing hearing that the Kingsley Trust's website was "[n]ever released" and was "not operating." The district court did not clearly err in rejecting Hall's unsworn assertions, because (1) T.J., C.O., and Jarman's associate viewed the website after Hall told them about it; (2) T.J. and C.O. completed a form on the website to obtain more information about the Kingsley Trust; and (3) C.O. accessed the website and subsequently invested in the Kingsley Trust.

We reiterate "mere use of a website is not sufficient to trigger" a mass-marketing enhancement.  See United States v. Hanny, 509 F.3d 916, 920 (8th Cir. 2007) (construing what is now U.S.S.G. § 2D1.1(b)(6), "a similar enhancement").[10] Hall did more than merely use a website.  Hall's website was not intended to be a garden-variety website: Jarman testified he worked over 1,000 hours on the website, for which Hall promised to pay him $50,000.  Hall placed "a billboard on the information superhighway" to advertise his fraudulent scheme.  Id.  Soliciting investments in the Kingsley Trust "was not a minor part of [the] website" but "the very reason the site existed."  Id.

## III.    CONCLUSION
We affirm.

_____

_____

[10]We note § 2D1.1(b)(6) and § 2B1.1(b)(2)(A)(ii) are not identical.  Section 2D1.1(b)(6) requires "mass-marketing *by means of an interactive computer service*." (emphasis added).  We do not decide whether the Kingsley Trust's website constituted "interactive" mass-marketing.