MEMORANDUM AND ORDER
 

 KOPF, District Judge.
 

 After an extensive evidentiary hearing, thoughtful briefing, and careful consideration, I granted Michael Severin Shasky’s (Shasky) motions (filings 45 and 47) for downward departure under the provisions of U.S.S.G. § 5K2.0 (p.s.).
 

 Shasky pleaded guilty to one count of receiving material via computer involving the sexual exploitation of a minor. 18 U.S.C. § 2252(a)(2).
 
 [1]
 
 (Filings 8 and 19.) The government charged and Shasky admitted that he had received pornographic images of minors via computer through services like “America-OnLine” (which was not itself the subject of the government’s investigation).
 

 Before departure, Shasky’s total offense level was 14 and his criminal history category was I. Had no departure been authorized, this offense level and criminal history category would have imposed: (a) a prison sentence of between 15 and 21 months; (b) a period of supervised release of between 2 and 3 years; (c) and a fine of between $4,000 and $40,000. (Sentencing Recommendation dated March 14,1996.)
 

 It is necessary to explain the basis for my departure. I do so in the following portions of this memorandum by discussing: (1) the methodology to be followed in departure cases generally; (2) the specific reasons for departure in this case; (3) the specific reasons for the extent of the departure; and (4) the government’s arguments against departure.
 

 THE METHODOLOGY
 

 I have followed the Supreme Court’s recent pronouncement of the appropriate methodology a district court should use when assessing a departure question.
 
 Koon v. United States,
 
 — U.S.-,-, 116 S.Ct. 2035, 2045, 135 L.Ed.2d 392 (1996) (stating four questions to be considered by sentencing court when considering departure, to wit: (1) what features take the case outside the heartland? (2) has the Commission forbidden consideration of those features? (3) has the Commission encouraged consideration of those features? and (4) has the Commission discouraged departures based on those features?).
 

 I have found as fact and concluded as a matter of law that this case is outside the “heartland” for two related reasons: Shasky is unusually susceptible to abuse in prison and he has engaged in extraordinary post-offense efforts at rehabilitation. I have therefore answered the first question posed by
 
 Koon.
 

 Having stated what it is that takes this case “outside the heartland,” I must next address the three remaining questions set forth in
 
 Koon. Id.
 
 First, in arriving at this departure, none of the factors that I rely upon are categorically prohibited from consideration by the Sentencing Commission. Second, the Commission has not encouraged consideration of any of the factors that I have considered. Third, some of the components of the factors that I rely upon would not normally justify consideration of a departure. For example, certain components of the factors I rely upon — mental or emotional condition, physical size, nature of past employment — are normally discouraged as departure factors.
 
 See
 
 U.S.S.G. §§ 5H1.3 (mental or emotional condition), 5H1.4 (physical condition) and 5H1.5 (employment record). Likewise, post-offense efforts at rehabilitation are not normally grounds for departure because rehabilitation efforts are considered when determining acceptance of responsibility. U.S.S.G. § 3E1.1, comment, (n. 1(g)). Moreover, other factors that I rely upon — like abuse in prison — are not mentioned at all by the Guidelines.
 

 When one is dealing with “discouraged” factors or factors already considered by the Guidelines,
 
 Koon
 
 counsels that “the court should depart only if the factor is present to an exceptional degree or in some other way makes the ease different from the ordinary case where the factor is present.”
 
 Id.
 
 Likewise, when a factor is not mentioned at all in
 
 *697
 
 the Guidelines “the court must, after considering the ‘structure and theory of both relevant individual guidelines and the Guidelines taken as a whole,’ decide whether it is sufficient to take the case out of the Guideline’s heartland.”
 
 Id.
 
 (citation omitted). And, when a court is departing on grounds not mentioned in the Guidelines, it must “bear in mind the Commission’s expectation” that such departures will be “ ‘highly infrequent.’ ”
 
 Id.
 
 (citing 1995 U.S.S.G. eh. 1, pt. A)
 

 I endeavor to address these points in detail in the remaining portions of this memorandum, but essentially I find and conclude that the “totality of the circumstances” — that is, the factors considered as a whole — take this sentencing decision outside the “heartland.”
 
 Id.
 

 REASONS FOR DEPARTURE
 

 As earlier stated, I have two reasons for departure. While these reasons must be viewed in the context of the totality of the circumstances, for the sake of clarity I discuss each reason separately.
 

 A.
 

 First, Shasky, a Nebraska state trooper at the time of the commission of the offense (Presentence Report (PSR) ¶ 67), is a homosexual (1 Tr. 41), of diminutive stature (height 5'7" and weight 130-135 pounds) (PSR ¶ 57), who is charged, in a well-publicized case, with receiving pornography involving minors, and he is therefore unusually susceptible to abuse in prison.
 
 Koon v. United States,
 
 — U.S. at---, 116 S.Ct. at 2050-2053 (district court did not abuse its discretion in departing downward because police officers were particularly likely to be targets of abuse in prison due to publicity surrounding case, and commenting that while physical appearance is not normally a proper ground for departure, the “Commission did not see fit, however, to prohibit consideration of physical appearance in all cases, nor did it address the broader category of susceptibility to abuse in prison.”)
 
 (citing United States v. Lara,
 
 905 F.2d 599 (2d Cir.1990) (upholding downward departure upon potential for victimization in prison due to size, immature appearance and bisexual orientation)).
 

 In this regard I have especially considered the following:
 

 1. the fact that the Bureau of Prisons informed the probation officer that Shasky would not be eligible for “boot camp” (Sentencing Recommendation of Probation Officer dated March 14,1996, at 4);
 

 2. the fact that Shasky would not be eligible for the Bureau of Prison’s sex offender program at the Federal Correctional Institution at Butner, North Carolina, because the program is no longer accepting “new referrals” and because Shasky is not a pedophile (Pit’s Ex. 5); and
 

 3. the fact that Shasky’s ease has drawn substantial publicity as evidenced by the press release issued by the United States Attorney which publicly “announced that Michael Shasky of Ogallala, a trooper with the Nebraska State Patrol, has been charged federally as a result of the nationwide FBI investigation of computer distributed ‘kiddie porn’.” (Press Release dated September 29, 1995, a part of Pit’s Ex. 6.)
 

 B.
 

 Second, Shasky’s efforts at rehabilitation have been extraordinary.
 
 United States v. Barton,
 
 76 F.3d 499, 503 (2d Cir.1996) (stating that “[a]n individual convicted of receiving child pornography may be entitled to a downward departure in light of his or her rehabilitative efforts, provided those efforts are extraordinary,” remanding for further fact finding, and stating that “[i]f the court does find support in the record for its conclusion that Barton’s rehabilitative efforts are extraordinary, reducing Barton’s sentence from a minimum of fifteen months’ imprisonment to probation would not be unreasonable.”)
 
 See also United States v. Simpson,
 
 7 F.3d 813, 819-20 (8th Cir.1993) (recognizing that post-offense rehabilitative efforts, while normally not grounds for departure, may support departure in “extraordinary circumstances” and noting that the “totality of the circumstances” may justify a departure where a single circumstance is not alone sufficient).
 

 
 *698
 
 In this regard I have especially considered:
 

 1. “all of the pertinent circumstances,”
 
 Barton,
 
 76 F.3d at 503 (quoting
 
 United States v. Maier,
 
 975 F.2d 944, 948-49 (2d Cir.1992)), including:
 

 (a) the nature of the crime and related relevant conduct consisting of the receipt or duplication of approximately 534 pornographic images of which about 54 involved minors (2 Tr. 4-6) (testimony of Margretta Dwyer, Director of the Sex Offender Treatment Program at the University of Minnesota Medical School);
 

 (b) the fact that shortly after his arrest Shasky was evaluated, at the request of the pretrial service officer, in a fairly superficial series of examinations and interviews and found not to be a suitable candidate for a sex offender treatment program because he denied that “he has any sexual problems” (Pit’s Ex. 2) (Intake Summary of Alpha Human Services), (Pit’s Ex. 1) (Assessment by Jeffrey G. Ford, M.A.);
 

 (c) the fact that the Nebraska Highway Patrol by written regulation equated the status of “homosexuality” with “serious misconduct” which could result in loss of employment (Pit’s Ex. 4 (attachment));
 

 (d) the fact that as a result of the Highway Patrol regulation and his homosexuality, Shasky turned to computers for a sexual outlet in an effort to hide his sexual orientation and keep his job (1 Tr. 42-43) (testimony of Margretta Dwyer);
 

 (e) the fact that as a result of his employment and sexual orientation Shasky was “in an unusually high-stress situation” and “had Mr. Shasky been employed in a law enforcement agency with a more accepting attitude towards homosexuality, it is possible this offense would never have occurred” because “both the written policy and social climate of the Nebraska State Patrol is not conducive to officers with homosexual attractions seeking any assistance to resolve their concerns and, thus, the mental health of the individual can deteriorate” (Pit’s Ex. 4 at 3) (Summary of Treatment, B.R. Simon Rosser, Ph.D., University of Minnesota Medical School);
 

 (f) the fact that Shasky is not a pedophile (1 Tr. 42; 2 Tr. 9-10) (testimony of Margretta Dwyer) and therefore poses no direct threat to minors; and,
 

 (g) the fact that Shasky has little sexual attraction to minors as evidenced by the fact that the great bulk of the pornographic images he obtained via the computer (approximately 90 percent) did not involve minors and those images which did involve minors involved post-pubescent minors in virtually all but two percent of the cases (2 Tr. 4-9) (testimony of Margretta Dwyer)
 
 [2]
 
 ;
 

 2. “the characteristics of the [treatment] program [ ]he has entered,”
 
 Barton,
 
 76 F.3d at 503 (quoting
 
 United States v. Maier,
 
 975 F.2d 944, 948-49 (2d Cir.1992)), including:
 

 (a) the fact that the program Shasky has entered — the sex offender program at the University of Minnesota Medical School — has a national and international reputation for excellence (1 Tr. 23) (testimony of Margretta Dwyer) and the program has been designed to specifically deal with persons charged with sex-related crimes such as pedophiles, incest perpetrators, obscene phone callers, and the like (1 Tr. 21) (testimony of Margretta Dwyer);
 

 (b) the fact that Margretta Dwyer, the director of the sex offender program, who twice testified before me in this case, has written 70 peer-reviewed articles on the treatment of sex offenders and is one of two sponsors of the International Conference on the Treatment of Sex Offenders (1 Tr. 20);
 

 (c) the fact that the program for the treatment of sex offenders at the University of Minnesota Medical School is an outpatient program normally lasting three years requiring successful completion of an initial 90-day trial period (1 Tr. 20-22),
 
 *699
 
 that the offender is seen at the medical school on an average of three to four times weekly in both group and individual treatment sessions
 
 (id.
 
 73-74), that every three months the offender, his therapist and the probation officer meet to assess the progress of the patient
 
 (id.
 
 at 74), that each month the offender would actually work with a therapist for between 10 and 12 hours
 
 (id.
 
 at 75), that the program requires attendance at a large group seminar four times a year with family members or other persons close to the offender
 
 (id.
 
 at 74), that the program requires “a lot of written work” including the maintenance of two types of journals
 
 (id.)
 
 and that the offender must report each week on such things as alcohol use, drug use, sexual activity and medication compliance
 
 (id.);
 

 (d) the fact that as a prerequisite for admission to the program, offenders like Shasky must undergo extensive testing to determine such things as propensity for violence and dangerousness (1 Tr. 24-26) (testimony of Margretta Dwyer), (Pit’s Ex. 4) (Summary of Treatment, B.R. Simon Rosser, Ph.D., University of Minnesota Medical School) (describing in-depth evaluation by Dr. Miner of the medical school which included three one-hour clinical interviews; the completion of an extensive psychological test battery which included the Millón Multiaxial Clinical Inventory-II, the Tennessee Self-Concept Scale, the Beck Depression Inventory, the Beck Anxiety Inventory, the Multiphasic Sex Inventory, the Deragotis Sexual Functioning Inventory and “a phallometric assessment of sexual arousal to various erotic material which varied in terms of the age and gender of subjects and the coerciveness of the sexual interaction”; review of the Minnesota Multiphasic Personality Inventory administered by another psychologist; review of the pretrial service officer’s report; and review of the report from Mi'. Ford (the psychologist who Shasky had seen shortly after his arraignment at the request of the pretrial service officer));
 

 3. “the progress []he is making, the objective indications of [his] determination to rehabilitate [himself], and [his] therapist’s assessment of [his] progress toward rehabilitation,”
 
 Barton,
 
 76 F.3d at 503-04 (quoting
 
 United States v. Maier,
 
 975 F.2d 944, 948-49 (2d Cir.1992)), including:
 

 (a) the fact that Shasky successfully completed his 90-day trial in approximately 60 days, the fact that he has been in treatment at the medical school for over six months without missing one appointment and the fact that his progress has been “extraordinary” according to the director of the program (2 Tr. 11-12) (testimony of Margretta Dwyer);
 

 (b) the fact that aside from an initial difficulty admitting his homosexuality, (Pit’s Ex. 3 at Conclusions (Psychological Evaluation by Michael H. Miner, Ph.D., University of Minnesota Medical School)), two experts confirm that testing “reveals in summary that [he] is essentially free of serious psychopathology” (Pit’s Ex. 4 (Summary of Treatment at Report of Patient Progress by B.R. Simon Rosser, Ph. D.)) and such testing “did not indicate in any way that he was a pedophile or had sex offending tendencies,” but rather, “[h]is scores were very healthy looking as compared to most offenders” (2 Tr. 10) (testimony of Margretta Dwyer);
 

 (c) the fact that Shasky is much more honest and candid than most sex offenders as evidenced by the fact that the director of the sex offender program personally reviewed each of the 534 images the government seized in this case
 
 after
 
 Shasky had first described the images to the staff at the medical school and that review confirmed to the very experienced Ms. Dwyer that “it was obvious that he had been honest in the beginning, even more honest than I thought” (2 Tr. 10-11) (testimony of Margretta Dwyer);
 

 4. “the hazards of interrupting that progress,”
 
 Barton,
 
 76 F.3d at 504 (quoting
 
 United States v. Maier,
 
 975 F.2d 944, 948-49 (2d Cir.1992)), including:
 

 (a) the fact that Margretta Dwyer personally contacted the Bureau of Prisons and learned that the treatment of choice for sex offenders — intensive and long-term interaction in structured group sessions with other offenders — would not be avail
 
 *700
 
 able to Shasky in the federal prison system because the Bureau of Prisons was not accepting new referrals for admission into the Bureau’s sex offender program, and because even if the Bureau of Prisons could provide other psychological services outside the context of its sex offender program, the Bureau could not provide Shasky with the “group therapy” with other sex offenders that the “literature points out today” is the treatment of choice (1 Tr. 46-47), and this finding was essentially confirmed by the Bureau of Prisons (Pit’s Ex. 5) (declaration of Dr. Thomas W. White);
 

 (b) the fact that Shasky’s “long term prognosis [is] excellent” and “his risk of reoffending is extremely minimal”
 
 “provided
 
 he completes treatment” (Pit’s Ex. 4 (Summary of Treatment at Report of Patient Progress by B.R. Simon Rosser, Ph. D., University of Minnesota Medical School)) (emphasis added);
 

 (c) the fact that the director of the sex offender program at the University of Minnesota Medical School believes that there is a hazard to interrupting Shasky’s treatment because “he’s on his way to mending, ... to interrupt is going to stop that process,” and once Shasky returns from prison there is a definite risk that he may lack sufficient motivation to successfully complete the
 
 program,
 
 particularly given the fact that the sex offender program at the medical school is both very expensive
 
 [3]
 
 and very hard to complete (1 Tr. 48-49).
 

 REASONS FOR EXTENT OF DEPARTURE
 

 Having explained why I have departed, I should now explain the reasons for the extent of the departure and the related sentence. With the exception of the fine, I decided that a sentence equivalent to a 4-level departure to total offense level 10 was appropriate. Of course, the criminal history category of I remained the same.
 

 If Shasky’s offense level was 10 with a criminal history category of I, the Guidelines would impose: (a) a custodial sentence of 6 to 12 months of incarceration, U.S.S.G. Chap. 5, Pt. A (sentencing table), but with the opportunity to substitute home confinement for prison time as a part of probation, U.S.S.G. §§ 5Bl.l(a)(2) and 501.1(c) & (e)(3); (b) a range of 2 to 3 years for supervised release and 1 to 5 years for probation, U.S.S.G. §§ 5B1.2(a)(2) and 5D1.2(a)(2); and (c) a fine range of $2,000 to $20,000, U.S.S.G. § 5E1.2(c).
 

 The extent of the departure was driven by an effort to select the sentence which best fits the dictates of 18 U.S.C. § 3553(a) (setting forth factors to be considered in imposing sentence).
 

 In particular, but certainly not exclusively, I was concerned with “providing] the defendant with needed ... correctional treatment in the
 
 most effective
 
 manner18 U.S.C. § 3553(a)(2)(D) (emphasis added). In this regard, I thought it necessary to require Shasky to complete, at his own cost, the intensive (and expensive) sex offender treatment program at the University of Minnesota given the absence of such a high-quality alternative with the Bureau of Prisons.
 

 It is very important to recognize that the University of Minnesota’s program is not primarily a therapeutic program, but rather is a quasi-correetional program intended to deal with criminal sex offenders. This is of course why the program has a close working relationship with probation officers, involving as it does those officers in a review of the offender’s progress four times a year.
 

 In addition, I was also particularly concerned that the victims of Shasky’s crime— the minors who appear in these sad and sordid images — be protected from further exploitation to the extent that a criminal sentence has a deterrent impact. 18 U.S.C. § 3553(a)(2)(B). I thus thought it appropriate to select a sentence that sent a message to those who knowingly receive this bilge that there are very painful consequences to the consumption of this material. I believed
 
 *701
 
 that a combination of home detention under electronic monitoring, a heavy fine, and an onerous public service obligation would serve such a deterrent function particularly for otherwise law-abiding individuals who create a market for the exploitation of minors.
 

 As a result of consideration of all these factors, I imposed a sentence of three years of probation including, among others, special conditions that Shasky (1) complete at his own cost the sex offender program at the University of Minnesota Medical School; (2) serve six months of his probation under home confinement with electronic monitoring and pay for the costs of electronic monitoring; (3) pay a fine of $30,000; (4) complete 600 hours of community service; (4) avoid any contact with minors unless approved by the probation officer; and (5) refrain from the use of “on-line” computer services.
 

 In the last analysis, precedent informed my decision. The departure and the related sentence that I chose was consistent with the
 
 Barton
 
 opinion, which dealt with a similar type of crime. In
 
 Barton
 
 the court suggested that a departure, driven by extraordinary efforts at rehabilitation, from offense level 14, criminal history category I, to an offense level authorizing probation “would not be unreasonable.” 76 F.3d at 504. I likewise find and conclude that a probationary sentence, albeit with intentionally harsh characteristics, is also reasonable in this case.
 

 THE GOVERNMENT’S ARGUMENTS
 

 The government passionately opposes the departure in this case. I am, however, not persuaded by either the justifiable outrage the government expresses regarding this crime or by the merit of the government’s arguments against departure. I address only those arguments of the government which warrant some mention.
 

 The government argues that the fact that Shasky is a homosexual and former police officer is irrelevant to the sentencing decision. As the
 
 Koon
 
 case points out, the government’s categorical argument in this regard is not consistent with Guideline sentencing.
 

 Certainly it is true that Shasky should not be sentenced differently than other like offenders simply because he was a police officer who was also a homosexual, just as it is true that an unemployed heterosexual candlestick maker should not be sentenced differently than otherwise similarly situated offenders. However, any person who is particularly susceptible to being abused in prison is as a matter of fact treated more harshly than otherwise similarly situated offenders if a court does not recognize that some people, for reasons entirely inconsistent with the Guidelines, are more likely to be abused in prison than other people. Such a sentencing scheme would neither be rational nor would such a scheme further the sentencing goal of imposing like punishment for like offenses. After all, abuse in prison is no part of an appropriate sentence.
 
 See, e.g.,
 
 18 U.S.C. § 3553.
 

 The government further argues that the fact that Shasky has lost his job and will be subject to various collateral consequences as a result of his conviction is irrelevant to the departure question. I agree. I have accorded no significance to the collateral consequences of Shasky’s conviction.
 

 Next the government argues that I should not treat Shasky differently than other like offenders simply because he is not a pedophile or simply because he is relatively healthy from a mental health point of view or simply because he is not likely to reoffend. The government states that such a defendant is by definition within the “heartland” of defendants covered by the Guidelines. Once again, I agree. But the government’s argument is a straw man as I have not departed for those reasons.
 

 The fact that Shasky is not a pedophile, is relatively healthy from a mental health point of view, and is not likely to reoffend are all relevant aspects to the assessment of whether Shasky’s efforts at rehabilitation have been extraordinary, and, if so, what the extent of the departure should be. In this regard, the government admits, as it must, that “the district court can depart if there had been ‘extraordinary treatment efforts.’ ” (Br.Resp.Mot. for Departure at 4.) Consequently, consideration of things which
 
 *702
 
 are normally irrelevant may be very relevant in the context of whether Shasky’s rehabilitative efforts have been extraordinary.
 

 The government further argues that since Shasky is relatively healthy, treatment at the sex offender program of the University of Minnesota Medical School is unnecessary. In essence, the government argues that it makes no sense to depart in order to allow an offender to pursue a treatment program that he does not need. If this were the case factually, I would agree. However, the facts are otherwise.
 

 It is true that Shasky’s mental health profile is a relatively healthy one generally, but that does not mean that Shasky does not need a rigorous sex offender treatment program. The evidence overwhelmingly proves that Shasky, an otherwise law-abiding person, became addicted to computer pornography and needs treatment for this compulsion (e.g., 1 Tr. 79-80) (testimony of Margretta Dwyer) (“he’s definitely got some sexual problems, and he’s got some issues around sexual eompulsivity because he [was] hooked like he was____ [W]e would almost give him a compulsive diagnosis.”); (PSR ¶ 64 (noting that Shasky “readily admits he was spending large sums of money in relationship to his income on this activity” and it was “noteworthy that Shasky likened his routine computer viewing of visual depictions of sexually explicit conduct to that of an ‘alcoholic’ or individual with a ‘gambling addiction.’ ”)). This addiction in turn brought Shasky into contact with electronic pornography involving minors. Shasky, and, more importantly, the public, will benefit if Shasky’s compulsion to express himself sexually via the computer is dealt with “in the most effective manner.” 18 U.S.C. § 3553(a)(2)(D).
 

 Further, the government argues that Shasky’s efforts have not been extraordinary since he sought the initial psychological evaluation and treatment at the suggestion of the pretrial service officer so that the officer could determine whether to recommend continued electronic monitoring during pretrial release. This assertion is true (1 Tr. 85-89) but meaningless.
 

 Shasky’s voluntary compliance with the officer’s suggestion hardly proves that Shasky’s subsequent efforts at rehabilitation have not been extraordinary. Indeed, Shasky was already on pretrial release at the time the pretrial officer made the suggestions, and the evaluation and treatment suggestion related to the continuance of electronic monitoring and not whether Shasky would remain on pretrial release. (1 Tr. 86-87.) Still further, no judicial officer or law enforcement agent required Shasky to enter the very rigorous
 
 sex offender program.
 
 The recommendation to enter the sex offender program was made by Dr. Rosser of the medical school and Shasky voluntarily agreed to enter the program as a result of that recommendation. (Pit’s Ex. 4 at Summary and Treatment and Report of Patient Progress). Most importantly, regardless of how Shasky ultimately found his way to the sex offender treatment program, the persons who are in the best position to know whether Shasky’s efforts have been extraordinary as compared to other sex offenders are the director and staff at the Minnesota medical school’s nationally recognized sex offender program. They have had the opportunity to deal with Shasky for more than six months, and all agree that Shasky’s efforts at rehabilitation, such as completing the 90-day trial in 60 days, have been extraordinary.
 

 The government also asserts that Shasky has not made extraordinary efforts at rehabilitation because he has not been honest with the medical school about the number of visual depictions of minors that he received. Although Shasky may have minimized his behavior before he got to the medical school, the facts do not support the government’s assertion that he was not candid with the medical school.
 

 As earlier noted, Ms. Dwyer reviewed an FBI video tape of the depictions. After viewing the tape, she concluded that “it was obvious that he had been honest in the beginning, even more honest than I thought.” (2 Tr. 10-11) (testimony of Margretta Dwyer.)
 

 Finally, the government makes a passing reference to “Scout 315,” a computer name for a young male with whom Shasky traded pornography (PSR addendum). The government argues that Shasky did not tell the
 
 *703
 
 medical school of his trading activity with “Scout 815,” and therefore Shasky has not been honest with the medical school. The government’s argument is factually inaccurate.
 

 In the addendum to the presentenee report, the government advised the probation officer in reference to “Scout 315” that “Mr. Shasky has explained that he did trade pornographic materials through other individuals online.” (PSR addendum.) Indeed, government’s counsel even advised the probation officer that “I do not feel at this point that the information involving ‘Scout 315’ should be utilized in determining the base offense level.”
 
 (Id.)
 
 Ms. Dwyer had the addendum to the presentence report in her records when she first came to testify. (1 Tr. 69.) It is therefore impossible to understand what it is about “Scout 315” or pornography trading in general that the government believes Shasky was hiding from the medical school.
 

 Still further, the government did not pursue the “Scout 315” trading issue with Ms. Dwyer when she twice testified before the court. This failure is curious inasmuch as Ms. Dwyer told government’s counsel at the evidentiary hearing that she had the addendum to the presentence report and that she had participated in an hour-long discussion with the probation officer. (1 Tr. 69-70.) If the government was concerned about whether Shasky had been candid with the medical school regarding trading activity generally, or “Scout 315” specifically, the government had a full and complete opportunity to develop the point with the director of the sex offender program, but the government simply ignored the matter. Given the government’s failure to pursue the matter with a representative of the medical school, I will attach the same significance to the point that the government did at the evidentiary hearing, and that is none at all.
 

 Accordingly,
 

 IT IS ORDERED that:
 

 1. the motions for downward departure (filings 45 and 47) are granted;
 

 2. the Clerk of the Court shall seal the entire presentenee report and sentencing recommendation.
 

 [1]
 

 . Shasky also consented to the forfeiture of computer equipment.
 

 [2]
 

 . I examined a video tape of the images. (Pit's Ex. 8.) From that review, I found that Ms. Dwyer's assessment of the number of minors compared to adults was accurate. In contrast, the assessment of the FBI agent (1 Tr. 105) and the probation officer (Sentencing Recommendation dated March 14, 1996, at 4) regarding the number of minors compared to adults was incorrect and exaggerated. In general, I found Ms. Dwyer to be an extremely candid and credible witness.
 

 [3]
 

 . The three-year program will cost Shasky approximately $21,000 to complete. (1 Tr. 52.) In addition, Shasky must pay the cost of his evaluation by the medical school in the sum of seven hundred dollars.
 
 {Id.)