UNITED STATES of America,
Plaintiff,

v.

Hamedah Ali HASAN, formerly known
as Stephanie Lomax, Defendant.

No. 8:92CR12–6.

United States District Court,
D. Nebraska.

March 10, 1999.

Michael G. Heavican, Maria R. Moran, Adam C. Cortez, Assistant United States Attorneys, Omaha, NE, for plaintiff.

John Stevens Berry, Michael J. Hansen, Corey Reiman, Lincoln, NE, for defendant.

## MEMORANDUM ON SENTENCING

KOPF, District Judge.

This case arises from a prison sentence imposed in 1993. At that time, the defendant was an angry, young, poorly educated, pregnant single mother of two children who had recently converted to the Islamic faith. A jury found that she substantially assisted her male cousin, the leader of a conspiracy, in a successful effort to distribute large quantities of crack cocaine. The jury's verdict was supported by overwhelming evidence of the defendant's guilt. Despite the fact that she had no prior criminal history, the guidelines required, and I imposed, a life sentence. *See United States v. McMurray,* 833 F.Supp. 1454, 1458–59, 1472–73, 1485 (D.Neb.1993), *aff'd* 34 F.3d 1405 (8th Cir.1994), *cert. denied* 513 U.S. 1179, 115 S.Ct. 1164, 130 L.Ed.2d 1119 (1995).

We now know that Ms. Hasan rejected a plea agreement that would have likely resulted in a prison sentence of between 10 and 13 years. We also now know that she wrongly asserted that her new religion prevented her from accepting such a deal. Her experienced trial lawyer recently questioned whether "she really was fully cognizant of the decision she was making" in refusing the offer.

More than five years have passed since I sentenced the defendant. In the interim, the defendant has given birth in prison to her third child and at least four prison officials have commended her good works. Moreover, an amendment to the guidelines was enacted,[1] and then made retroactive,

---

1. Amendment 505 reduced the base offense level in U.S.S.G. § 2D1.1(c) for 1.5 kilos or more of cocaine base to 38 as compared with a base offense level of 40 where, as here, the defendant was held responsible for at least 5 kilos, but less 15 kilos, of cocaine base. Appendix C, *Amendments to Guidelines Manual,*

which reduces her base offense level should I decide to resentence her. *See* U.S.S.G. § 1B1.10(a) & (c) (reduction in term of imprisonment as a result of amended guideline range) (listing Amendment 505 as an amendment to be applied retroactively).

On February 5, 1999, I resolved two motions. One motion was the defendant's section 2255 motion. The other motion was the defendant's motion to reduce her prison term. I denied the section 2255 motion. On the other hand, I granted the motion to reduce the defendant's sentence,[2] scheduled a sentencing hearing, and gave notice that:

> I intend, at a minimum, to resentence the defendant to the lowest sentence allowed by the retroactive guideline amendment. *See* 18 U.S.C. § 3582(c)(2).[3] I also give notice that the court has the authority to consider a downward departure under U.S.S.G. § 5K2.0 (p.s.) at resentencing, and that I am considering such a departure due to the defendant's extraordinary post-offense efforts at rehabilitation.
>
> (Filing 580 at 2–3.)

The government responded to my notice. It admitted, as it had previously done, that I had the authority to resentence the defendant pursuant to Amendment 505. However, the government asserted that I had no jurisdiction to depart downward. After that, we held an evidentiary hearing on the resentencing issue. The defendant and the government were heard.

At the conclusion of the hearing, I applied Amendment 505, departed downward, and resentenced the defendant to 144 months in prison. I now explain why

the government is incorrect in its assertion that a district court always lacks the authority to depart downward after applying a retroactive guideline amendment. In short, when the basis for the departure is post-conviction rehabilitation, as opposed to a departure based upon facts that existed at the time of the original sentence, the court has the power to depart.

## I. BACKGROUND

A description of the procedural history and factual background of this case is necessary to an understanding of this opinion. I proceed to that description next.

### A. The Trial, Sentencing and Appeal

A jury found the defendant guilty of all eight counts of the superseding indictment that pertained to her. The jury found the defendant guilty of conspiracy to distribute cocaine and seven *"Pinkerton"* counts involving the distribution of cocaine in furtherance of the conspiracy. The defendant was named as an actor in some of the *Pinkerton* counts but not in others. *McMurray*, 833 F.Supp. at 1457–58 n. 1.

The trial evidence proved that the defendant, and her cousins, Tracy Lomax and Oscar McMurray, came from Oregon to Nebraska to sell crack cocaine. Thereafter, various other individuals helped them. The conspiracy distributed approximately 12.6 kilos of crack cocaine. *Id.* at 1469–71.

Tracy Lomax was the undisputed leader of the conspiracy, but the defendant played a significant role. *Id.* at 1485. The evidence established that Ms. Hasan assisted in the transportation of powder cocaine from the West Coast to Nebraska so that it could be converted into crack cocaine. Ms. Hasan sold kilo quantities of

---

Amendment 505, at 330–31 (effective date of amendment, November 1, 1994).

**2.** I did so after ordering and receiving an updated presentence report (also called Second Revised Presentence Investigation Report ("PSR2d")).

**3.** The statute provides in pertinent part that when "a defendant who has been sentenced

to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission pursuant to 28 U.S.C. § 994(*o*)" requests, the district court may "reduce the term of imprisonment, after considering the factors set forth in section 3553(a) to the extent that they are applicable, if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." *Id.*

crack cocaine when Tracy Lomax was unavailable. She directed at least one other person to sell crack cocaine. She knew where the crack cocaine was hidden. She wire transferred sums of money amounting to nearly six times the wholesale price of a kilo of crack.

After a lengthy evidentiary hearing, I decided that the defendant was responsible for 5.9 kilograms of crack. *Id.* at 1472–73. Consequently, her base offense level was 40. *Id.* at 1472. I also decided that she was a "manager," but not an organizer or leader. *Id.* at 1485. In addition, I decided that there was no basis to depart downward because the crack guidelines, as compared with the powder cocaine guidelines, violated the defendant's equal protection rights as an African–American. *Id.* at 1459–67. In the end, the defendant's total offense level was 43 and her criminal history category was I.[4] *Id.* at 1485. Using the 1992 manual, the guideline sentence was life in prison. *Id.*

When the conspiracy began in April of 1988, the defendant was 20 years old. *Id.* at 1457. n. 1.[5] At the time of sentencing in 1993, the defendant was 25 years old. *Id.* at 1458. When I sentenced her, she was unmarried, pregnant and had two children. *Id.* She had earned enough credits for a general equivalency diploma, and had been on public assistance for the four years preceding her sentencing. *Id.* She had taken a Muslim name. *Id.* at 1458 n. 3.

During sentencing, the defendant adamantly denied her guilt, stating that "my long-time suspicions about the Government and this so-called justice system have been confirmed. I have been accused and convicted of crimes in which I am innocent." (Filing 442, sentencing transcript at 8.) She questioned how "elderly, silver-haired, conservative, European–Americans" could

sit in judgment of her. (*Id.* at 9.) She charged that the "government and judicial system" was "unfit to judicate (sic) over anyone." (*Id.*) She concluded by stating: "I am proud to have submitted to the will of Allah and with Allah ... alone, do I seek refuge." (*Id.*)

The defendant appealed. Her conviction and sentence was affirmed. *McMurray,* 34 F.3d 1405. The Court of Appeals found that the "government introduced ample evidence linking [the defendant] to the conspiracy." *Id.* at 1413. The Court of Appeals also stated that there was "ample testimony from which the district court could have found that [the defendant] was a manager or supervisor in the conspiracy." *Id.* at 1415. The Supreme Court declined to review the case. *McMurray,* 513 U.S. 1179, 115 S.Ct. 1164, 130 L.Ed.2d 1119.

## B. The Section 2255 Motion

As noted earlier, there were two motions pending before me. One was a section 2255 motion, and the other was a motion seeking to reduce the prison sentence. The evidence regarding the section 2255 motion is also pertinent to the motion to reduce sentence. That being said, I proceed next to briefly describe the 2255 motion, the facts underlying it, Judge Piester's report and recommendation, and my resolution of that motion.

### 1. Background

The defendant filed a section 2255 motion contending that her conviction ought to be set aside primarily because she believed that she had received ineffective assistance of counsel when her trial lawyer failed to fully advise her that she might be sentenced to life in prison if she rejected a plea offer and was found guilty. (Filing 567, at 1–10.)[6] After an evidentiary hear-

---

4. The defendant had no criminal history. *Id.* at 1458.

5. Her date of birth is November 15, 1967. PSR2d at 3.

6. The defendant also argued that: (1) her sentence was based upon a misapplication of the guidelines because I should have treated

the substances involved as powder cocaine rather than crack cocaine; (2) I erred in enhancing her base offense level for being a manager and, in any event, that such an enhancement was unjust in light of a subsequent non-retroactive guideline amendment; and (3) counsel was ineffective for failing to raise the crack vs. powder and enhancement issues

ing, Judge Piester concluded that the defendant's trial counsel had properly advised the defendant and that, in any event, the defendant failed to show prejudice because she would have never accepted the plea agreement. (*Id.* at 6–10.)

At the evidentiary hearing in support of her motion, Defendant testified that she initially conferred with her court-appointed counsel, Ms. Susan Ann Koenig,[7] prior to her initial appearance in Omaha. After her initial appearance, Defendant returned to Portland, Oregon, where she was residing at the time she was charged in the indictment. According to Defendant, she met with Ms. Koenig approximately three times prior to her trial, and at no time did Ms. Koenig ever tell her that she could face life imprisonment if she were convicted of the crimes charged. (Filing 566 at 22:122–14.)

Defendant also testified that only twice did Ms. Koenig discuss a possible plea bargain with the government. Defendant stated that on the first occasion Ms. Koenig told her that the government was willing to grant her immunity in exchange for her testimony. (*Id.* at 24:8–16.) According to Defendant, she rejected the plea offer because, at the time, she erroneously believed that as a Muslim she could not plead to a judge, but only to Allah. (*Id.* at 24:17–25:11.)

The second occasion occurred on the day of Defendant's trial. (*Id.* at 26:1–6.) According to Defendant, under the terms of the second agreement, if Defendant pleaded guilty, she would receive a ten-year sentence. (*Id.* at 26:13–19.) Defendant testified that at the time she rejected this plea bargain, she was unaware that she could be sentenced to life imprisonment if she were convicted. (*Id.* at 27:15–28:3.) Defendant stated that she believed she was facing only ten years in prison anyway, so she did not see the benefit in pleading guilty.

Defendant further testified that Ms. Koenig did not explain to her how the sentencing guidelines operated. Nor did Ms. Koenig explain to Defendant that because the defendant was charged with conspiracy to distribute cocaine, she could be held accountable for drugs attributed to other members of the conspiracy. (*Id.* at 28:4–29:6.) Defendant did not recall a meeting at a correctional center with the other defendants on the eve of trial to discuss whether they should plead guilty. (*Id.* at 32:20–33:5.)

At the evidentiary hearing on the 2255 motion, the defendant readily admitted that she was guilty of the conspiracy. (*Id.* at 38:13–39:22.)[8] She specifically admitted actually distributing cocaine for Tracy Lomax. As to the *Pinkerton* counts, she denied involvement in some of them.[9] She testified that she told her trial lawyer that she was guilty of some of the things charged by the government, but that she was not guilty of every allegation.

The defendant testified that in 1993 she had recently converted to the Islamic religion and that she believed her new religion prohibited her from submitting to the authority of a civil court. (*Id.* at 24:17–25:25.) She remembered telling her law-

---

on appeal. (Filing 567 at 10–15.) Judge Piester found that none of these claims had factual or legal merit. I adopted Judge Piester's recommendation regarding these claims. As Judge Piester also noted, the defendant abandoned other claims. (*Id.* at 7 n. 2.) I also agreed that the defendant abandoned these other claims.

7. At the time Ms. Koenig represented Defendant, she was known as Susan Koenig Cramer.

8. As a matter of a fact, the defendant wrote the court shortly after the evidentiary hearing

to reiterate this admission. According to Judge Piester, the defendant apologized "to Judge Kopf for certain statements that she made at her sentencing hearing and for participating in the selling of cocaine." (Filing 567 at 3; *see also* filings 562 & 563.)

9. It is worth remembering that some of the *Pinkerton* counts did not name the defendant as an actor. Her liability flowed from the fact that the acts were foreseeable to her and in furtherance of the conspiracy.

yer "that I plead to no one but Allah." The defendant also testified that she subsequently discovered that her religion did not prohibit her from pleading guilty.

At the evidentiary hearing on the § 2255 motion, Mr. Stuart Dornan, an attorney who has practiced law in Nebraska for the past ten years, testified that he represented Oscar McMurray, defendant's codefendant, throughout his criminal proceedings. According to Mr. Dornan, he, Lawrence Whelan, who represented Tracy Lomax, and Ms. Koenig met with their respective clients at the correctional center on the eve of trial. (*Id.* at 70:19–71:6.) Mr. Dornan stated that the purpose of this meeting was to discuss whether the defendants would accept the government's plea offers.[10] While at the meeting, Mr. Dornan heard Ms. Koenig advise Defendant that she faced a possible life sentence. (*Id.* at 73:16–18 & 79:25–80:4.) Mr. Dornan also remembered Defendant rejecting the plea bargain offered by the government, but he is unsure of the reason why she rejected it. (*Id.* at 80:10–81:20.)

Mr. Dornan testified that after this meeting his client initially accepted a plea agreement and twice unsuccessfully tried to enter an *"Alford"*[11] plea on the day trial began. (*Id.* 82:1–83:2.) Mr. Dornan stated that his client tried to enter an Alford plea because Dornan's client, like the defendant, believed that the Islamic religion would not allow him to directly submit to the authority of the court. In the end, Dornan's client refused to complete the plea and he went to trial instead.

Dornan's testimony about his client's efforts to enter an *Alford* plea because of religious reasons is consistent with the record. *See McMurray,* 833 F.Supp. at 1479 ("Counsel for McMurray stated that his client wished to enter an *Alford* plea because of his religious beliefs, which I understood precluded McMurray from admitting that a civil court had any authority

over him. Twice on the day trial began, (Filing 313:Court Minutes), McMurray started to enter a plea, and twice he apparently became confused and uncertain and did not complete the process.")

Following Mr. Dornan's testimony, Ms. Susan Koenig, an attorney who has practiced law in Nebraska for approximately the past 18 years, testified that she was appointed to represent the defendant in November of 1992. According to Ms. Koenig, she explained to the defendant the possible penalties that Defendant faced should Defendant be convicted of the crimes charged. (Filing 566 at 107:14–19.) She also explained to the defendant how the sentencing guidelines operated and that she could be held accountable for drugs attributed to other members of the conspiracy.

Ms. Koenig further testified that she discussed the possibility of entering into a plea agreement with the government, but that Defendant was adamant that she did not want to plead guilty. (*Id.* at 123:12–16.) According to Ms. Koenig, Defendant did not want to enter into a plea agreement for two reasons. First, because Defendant would plead to no one but God, and, second, because Defendant proclaimed her innocence. (*Id.* at 123:8–23.) Ms. Koenig testified that Defendant never acknowledged her guilt before or after the trial. (*Id.* at 133:18–135:7.)

Ms. Koenig testified that the only plea offer that she received from the government was a few days prior to trial. (*Id.* at 124:12–125:4.) Very shortly before trial, the government made an oral offer to the defendant's counsel. According to Ms. Koenig, thereafter, on the day before trial, Koenig had a meeting with all the defendants and their counsel where the offer was discussed and rejected by the defendant. (*Id.* at 125:5–129:21.) Ms. Koenig recalled "my urgency in encouraging her

---

**10.** Apparently all the defendants were offered plea agreements. Aside from the fact that the defendants were family members, it was never made clear why a joint meeting was held.

**11.** *See North Carolina v. Alford,* 400 U.S. 25, 37, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).

to accept the plea," (*id.* at 132:16–17), but the defendant refused saying "the same things that she had said at all times." (*Id.* 129:12–15.) Ms. Koenig testified that at this meeting she again advised the defendant that she was facing life in prison if she were convicted. (*Id.* at 127:22–128:11.)

Although the plea agreement offer was oral, Ms. Koenig kept notes summarizing the offer. (Filing 560, Deposition of Susan Koenig at 17–18 and Deposition Ex. 2). From her notes, she was able to recount the specifics of the offer. (*Id.* Depo. at 18:2–23:21.) The offer was a plea to the conspiracy which set the defendant's base offense level at 34, [12] and her total offense level, after a two point reduction for acceptance of responsibility, at 32. (*Id.* at 19:6–15.) Given the defendant's lack of criminal history, Ms. Koenig believed that if the defendant accepted the deal, and was given two points for acceptance of responsibility, she would have been exposed to a range of imprisonment of between 121 months and 151 months. (*Id.*) Her belief is consistent with the guideline manual then in effect. U.S.S.G. *Guidelines Manual*, Ch. 5, Pt. A., Sentencing Table (1992) (Offense Level 32 and Criminal History Category I).

Ms. Koenig's notes reflect that the defendant rejected the plea because the defendant would only "plead to God" and because "I'm not guilty." (Filing 560, Deposition of Susan Koenig at 31:12–33:6; Dep.Ex. 3.) Ms. Koenig testified that in retrospect she may not have understood that the defendant was refusing the plea offer for religious reasons. (*Id.* at 45:16–46:12.) In fact, Koenig now questions whether the defendant understood the significance of the defendant's decision to reject the plea agreement. For example, Koenig stated: "I don't know how she

could have made the choice that she did if she really was fully cognizant of the decision she was making." (*Id.* at 37:22–25.)

The next day, as trial was about to begin, Ms. Koenig again encouraged the defendant to accept the government's plea offer. However, the defendant refused. (Filing 566 at 133:4–18.) Accordingly, the defendant went to trial with her co-defendants and was ultimately convicted. The defendant did not take the witness stand. (Filing 468, Master Index.)

## 2. Resolution of the § 2255 Motion

I rejected the defendant's § 2255 motion relying upon Judge Piester's opinion. I added the following:

The defendant argues that she was not adequately advised of the consequences and implications of going to trial versus accepting the plea bargain. She asserts that had she been properly advised that she would have taken the plea bargain. Even if I assume that Judge Piester is wrong, and that Ms. Koenig's advice fell below the standard of care, the defendant cannot show prejudice.

As she acknowledges, in order to succeed in her § 2255 motion premised upon ineffective assistance of counsel, she must prove that she would have accepted the plea offered by the government had she received proper advice from her lawyer. *See, e.g., Engelen v. United States*, 68 F.3d 238, 241 (8th Cir.1995) ("To establish prejudice, however, the movant must show that, but for his counsel's advice, he would have accepted the plea.") It is clear beyond question that the defendant would never have accepted the plea in 1993, although she may honestly believe otherwise in

---

**12.** During her deposition, Ms. Koenig was allowed to privately confer with government's trial counsel and she was able to compare her recollections with those of the government's lawyer. (*Id.* 23:4–10.) In particular, the government's counsel confirmed that if the defendant accepted the plea agreement the drug quantity attributed to the defendant by the

government would have been limited to between 150 grams and 500 grams. (*Id.* 23:19–20.) Using the 1992 Manual, that quantity of crack would have provided a base offense level of 34. U.S.S.G. § 2D1.1(c)(5) (1992). If the 1998 Manual was used, the base offense level would remain 34. U.S.S.G. § 2D1.1(c)(3) (1998).

1999. Two factors are especially convincing on this point.

First, the defendant's statements at the sentencing hearing, after the presentence investigation report was prepared and she knew the results of her failure to accept the plea, reflect the defendant's insistence that she was not guilty and would submit only to Allah. This is precisely what Ms. Koenig's notes reflect that defendant told her before trial. Even when confronted with the stark consequences of her decision to reject the plea and instead go to trial, the defendant voiced no claim that her decision would have been different had she only been given the proper advice. *Id.* (emphasizing lack of prejudice when "after completion of the trial, Engelen continued to assert his innocence").

Second, Mr. Dornan's client, and the defendant's cousin McMurray, also held religious beliefs against submitting to the jurisdiction of the court for the purpose of pleading guilty. Dornan, an experienced lawyer, like Koenig, was unsuccessful in attempting to persuade his client to plead guilty. Indeed, the record reflects that McMurray twice aborted Dornan's effort to have McMurray enter an *Alford* plea. Dornan's failed experience is strong support for the conclusion that: (1) Koenig could have done no better; and (2) the defendant would not have accepted the plea agreement under any circumstance.

In sum, the defendant's § 2255 motion will be denied. The defendant's 1993 decision to reject the plea agreement would not have changed had her counsel done something different. Consequently, even if Ms. Koenig's advice is found wanting, it caused the defendant no harm.

(Filing 580 at 15–17.)

## C. Other Information Pertinent to Resentencing

In addition to the information described above, there is additional information that is pertinent to resentencing. I turn to that information next.

After the government conceded that Amendment 505 was retroactive, I directed the probation office to prepare an updated presentence report. (Filing 575.) Specifically, I directed the probation office to address Amendment 505, the defendant's conduct while in prison, and any grounds for departure. (*Id.*) The probation officer has now submitted that report to counsel and the court. (PSR2d.)

The probation officer found that if Amendment 505 was applied, and holding everything else the same, the defendant's total offense level would be 41 and her criminal history category would be I. (PSR2d ¶ 97) This calculation would result in a guideline imprisonment range of 324 to 405 months for those counts where the statutory maximum sentence was life in prison as in the case of the conspiracy. (*Id.*) [13] The statutory maximums would set the imprisonment ranges for the other counts where the maximum statutory sentence was less than the guideline imprisonment range. (*Id.*) (Citing U.S.S.G. § 5G1.1.)

Since the late fall of 1993, the defendant has been housed at the Federal Correctional Institution at Dublin, California. (FCI, Dublin.) According to a progress report from FCI, Dublin, the defendant's institutional adjustment "is good" and she "has a record of clear conduct." (*Id.* at ¶ 73.) According to the revised presentence report, three prison officials have specifically commended the defendant for her good works.

Her supervisor at the business office commended her because "[s]he was always looking for new methods to improve the procurement operation." (*Id.* ¶ 82.) [14] As

---

**13.** The probation officer used the 1998 manual. (*Id.* at ¶ 49.) I agree that this is the proper manual to use upon resentencing. *See* U.S.S.G. § 1B1.11(a) ("The court shall use the Guidelines Manual in effect on the date that the defendant is sentenced.")

**14.** The defendant has been continually employed at FCI, Dublin. She has worked on the plumbing detail, as an orderly, and in the business office. (*Id.*)

a result, she was rated "as an Outstanding worker." (*Id.*)

The Muslim Chaplin at the prison commended the defendant. (*Id.* ¶ 174 and attached letter from Imam Rasheed Shabazz.) He commended the defendant because "[o]ver the years, she has assisted me in serving the [Islamic religious] community and it has been and is a blessing that I am ever grateful for." (*Id.*) He complimented the defendant's "character, behavior, level of maturity and integrity" as well as "her commitment to be a good Muslim." (*Id.*) [15]

In a memorandum to the defendant's case manager entitled "Letter of Commendation for Inmate Hasan," the Reverend Ronald Richter, religious services supervisor for FCI, Dublin, wrote that since arriving at Dublin in 1993 "I have personally witnessed her spiritual growth and maturity." (*Id.* ¶ 81 and attached letter of commendation.) Reverend Richter observed that the defendant is a "fine model among her peers," [16] "always ready to help," has "assisted Chapel Clerks on many occasions," and has "volunteered her time to organize Islamic literature in the Chapel to be used by everyone." (*Id.*) According to Reverend Richter, the defendant "participates in Arabic classes and study groups to enhance her Islamic knowledge." (*Id.*)

Reverend Richter also observed that the defendant "not only stays actively involved in Islamic affairs, but has sought to improve herself in other areas, such as Parenting classes and taking advantage of other educational opportunities." (*Id.*) He concluded that "Ms. Hasan will be a valuable asset to her family and the community upon release." (*Id.*)

The updated presentence report describes the various courses and classes that the defendant has taken while in pris-on. (*Id.* ¶¶ 77 & 81.) They include the following: (1) a 40 hour drug education program; (2) a 40 hour work and parenting from a distance program; (3) a 36 hour parenting from a distance ·program; (4) a 33 hour "Mega skills" program; (4) a "12 Step Islamic Drug Abuse Program"; (5) a class in stress management and conflict resolution; (6) a two hour family dynamics workshop; (7) a conscious embodiment class; (8) 100 hours of word processing training; (9) 15 hours of accounting training; (10) 40 hours of a computer applications lab; and (11) 30 hours of spreadsheet training. (*Id.*)

The defendant is currently enrolled in four classes. · (*Id.* ¶ 81.) Those classes are: (1) an Arabic class; (2) a word processing class; (3) an Arabic language and Islamic studies class; and (4) an Islamic 12–step program. (*Id.*)

As previously noted, the defendant is unmarried and she has three children. (*Id.* ¶ 71.) The children are 14, 10 and 5 years old respectively. (*Id.*) The youngest child was born in prison. The children are all in the custody of the defendant's mother. (*Id.*) The two oldest children have written the court seeking early release for their mother. (*Id.* attached letters.)

The probation officer has stated that: "To this officer's knowledge, Ms. Hasan has *never* made any statements, during the pretrial phase or now, which indicates she accepts responsibility for the offenses of conviction." (*Id.* ¶ 48.) (Emphasis in original.) The probation officer's report, in this regard, is incorrect. As noted earlier, the defendant, both in her testimony before Judge Piester and in a letter to the court, clearly accepted responsibility for distributing cocaine as a part of the con-

---

**15.** A civilian volunteer coordinator at the prison also echoed these sentiments. (*Id.*, attached letter of Ruby J. Habeebullah.)

**16.** A former fellow inmate, who has been released from prison, confirmed Reverend Richter's views. She wrote that the defendant "impressed me with the depth of her religious convictions, and with the way she conducted herself within the obviously difficult conditions of prison life. Hamedah was always a positive influence on the people around her, a real role model for younger women coming into the institution." (*Id.* attached letter from Donna Willmott .)

spiracy. (Filing 567 at 3; filing 566 at 38:13–39:22; filing 563.)

The probation officer acknowledged the "extraordinarily lengthy term of incarceration for an individual with no prior criminal conviction." (PSR2d ¶ 120.) The probation officer also recognized that the defendant "has demonstrated an excellent work ethic, and has taken courses to better her situation." (*Id.* ¶ 124.) Nevertheless, the officer could "identify no factors that warrant departure from the revised guideline imprisonment range." (*Id.* ¶ 126.)

Subsequent to the submission of the updated presentence report, the defendant filed a motion, which I granted, seeking to provide additional information. Attached to the motion is a memorandum of Frank Shaffer, system administrator, for the prison industries program known as "UNICOR" at FCI, Dublin. (Filing 579, attached letter.) In that memorandum, Mr. Shaffer recites that Ms. Hasan is a payroll clerk and is responsible for inputting and reconciling the time records for the entire inmate work force, consisting of over 260 workers. (*Id.*) Mr. Shaffer commends the defendant for being a "competent and reliable worker." (*Id.*)

According to Mr. Shaffer, soon after she was hired, the defendant "was quickly able to accomplish the job on her own with little supervision." (*Id.*) She performed tasks "unrelated to her assigned duties, and she undertook these cheerfully and without hesitation." (*Id.*) She uses her idle time "to better herself by teaming new skills." (*Id.*) Shaffer concluded that the defendant "has a sunny disposition which markedly improved the atmosphere of the business office." (*Id.*)

At the evidentiary hearing on resentencing, the defendant produced more evidence of her rehabilitation. In a letter, Tina Stocking, a unit counselor at FCI, Dublin, who has supervised the defendant since 1994, stated that she too has "witnessed Ms. Hasan's personal, educational, and spiritual growth." (Ex. 101.) According to Ms. Stocking, the defendant has made "exceptional efforts towards self-improvement." (*Id.*) "Her programming while being incarcerated at FCI Dublin has been exceptional." (*Id.*) "Ms Hasan has been a role model among her peers and has been ready and willing to help whenever called upon." (*Id.*) "She continues to keep herself actively involved in several educational, spiritual and self-improvement courses." (*Id.*) "Upon her release from incarceration she will be a productive member of society." (*Id.*)

## II. ANALYSIS

The determination of the proper sentence to impose when applying a retroactive guideline amendment is governed by 18 U.S.C. § 3582(c)(2) as interpreted by *United States v. Wyatt,* 115 F.3d 606, 609 (8th Cir.1997) (district court abused its discretion in denying motion to resentence under retroactive guideline amendment).[17] The *Wyatt* court specified a two-step process. I applied that process in this case.

### A. The First Step

The *Wyatt* court described the initial step this way:

First, by substituting only the amended sentencing range for the originally determined sentencing range, and leaving all other previous factual decisions concerning particularized sentencing factors (e.g., role in the offense, obstruction of justice, victim adjustments, more than minimal planning, acceptance of responsibility, number of plants, etc.) intact, the district court must determine what sentence it would have imposed had the new sentencing range been the range at the time of the original sentencing.

*Id.*

Changing nothing but the amended sentencing range, I would have sentenced the

17. *See also* U.S.S.G. § 1B1.10 (Reduction in Term of Imprisonment as a Result of Amend-ed Guideline Range).

defendant to the lowest possible sentence. In other words, I would have imposed a sentence of 324 months where the maximum statutory sentence was life in prison. I would have imposed the statutory maximum where that maximum was less than the minimum guideline range of 324 months and the maximum thus became the guideline range. I said as much at the time of sentencing. (Filing 442 at 17:6–8.) ("Had I the discretion, I would have imposed a sentence of between 10 and 15 years.")

**B. The Second Step**

"Second, having made the first determination, the district court must consider that determination together with the general sentencing considerations contained in section 3553(a) and, in the exercise of its thus informed discretion, decide whether or not to modify the original sentence previously imposed." *Wyatt,* 115 F.3d at 609. It is in the application of this second prong that the parties and I have a disagreement.

The defendant argued that the court is free to reexamine the decisions it previously made when it resentences. In fact, the defendant argued that I should reconsider such issues as role in the offense, whether the drugs involved were crack cocaine, and whether the defendant accepted responsibility. The government argued that the court never has the authority to sentence below the guideline range imposed by the retroactive amendment. I disagreed with both the defendant and the government.[18]

■ As for factual decisions previously made, I read *Wyatt* to prohibit me from changing those decisions. The opinion states that I am to "leav[e] all other previous factual decisions concerning particu-

larized sentencing factors … intact." *Id. Wyatt* gives us examples of what must not be changed. While the defendant argues that I may reexamine the decision of whether the defendant was a manager, *Wyatt* instructs that I must leave intact "role in the offense." *Id.* Despite the defendant's assertion that I should reconsider acceptance of responsibility, *Wyatt* suggests that the "acceptance of responsibility" decision should remain the same. *Id.* The same is true for drug quantity decisions. *Id.* ("number of plants"). Accordingly, I refused to change the factual decisions that I previously made at sentencing.

■ On the other hand, I also rejected the government's absolutist argument that the new sentence can never be less than the guideline range imposed by the retroactive amendment. On the contrary, and although there are certain limitations, the retroactive guideline amendment statute, 18 U.S.C. § 3582(c)(2), authorizes and directs me to consider departures under U.S.S.G. § 5K2.0 (p.s).

The operative statute states that when a retroactive amendment has been promulgated that reduces the sentencing range, the "court may reduce the term of imprisonment, after considering the factors set forth in section 3553(a)." 18 U.S.C. § 3582(c)(2).[19] Section 3553(a) instructs that the "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). The "court, in determining the particular sentence to be imposed, shall consider … any pertinent policy statement issued by the Sentencing

18. The government may have altered its position in its last brief. In that brief the government concedes that "had a downward departure motion been filed at the time of the original sentence this court would have the discretion to revisit the issue under the process delineated in *Wyatt.*" Gov't's Resp. to Mem. and Order at 4 (March 8, 1999). The government apparently believes that a frivolous motion for departure at the original sen-

tencing would have preserved the defendant's right to make a well-grounded departure motion at a later resentencing. This argument makes no sense.

19. Likewise, *Wyatt* states the "court must consider … the general sentencing considerations contained in section 3553(a)." *Wyatt,* 115 F.3d at 609.

Commission pursuant to 28 U.S.C. § 994(a)(2) that is in effect on the date the defendant is sentenced." 18 U.S.C. § 3553(a)(5). *See also Wyatt,* 115 F.3d at 609 ("Section 3553(a) provides a list of relevant factors to consider in every sentencing determination, including ... any pertinent policy statement issued by the Sentencing Commission.")

Section 994(a)(2) directs the Sentencing Commission to promulgate "general policy statements regarding application of the guidelines or any other aspect of sentencing or sentence implementation that in the view of the Commission would further the purposes set forth in section 3553(a)(2)." 28 U.S.C. § 994(a)(2). *See also Stinson v. United States,* 508 U.S. 36, 41, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993) (discussing policy statements and section 994(a)(2)). As is evident from the words "Policy Statement" in the title, section 5K2.0 of the guidelines is a "policy statement" within the meaning of section 994(a)(2). *See* U.S.S.G. § 5K2.0 (p.s.) ("*Grounds for Departure* (Policy Statement)"). This policy statement authorizes departures below the guideline range for cases outside the "heartland." *Id. See also Koon v. United States,* 518 U.S. 81, 116 S.Ct. 2035, 2044–45, 135 L.Ed.2d 392 (1996) (discussing U.S.S.G. § 5K2.0 (p.s.)).

In fact, the *Wyatt* opinion specifically recognized that the district court retained "unfettered discretion" to consider a substantial assistance departure motion when applying a retroactive guideline amendment. 115 F.3d at 610 ("The district court retains unfettered discretion to consider anew whether a departure from the new sentencing range is now warranted in light of the defendant's prior substantial assistance.") (citing U.S.S.G. § 1B1.10).[20] Although the *Wyatt* departure had been considered at the time of the original sentence and, to that extent, is different from this case, the holding of *Wyatt* remains unequivocal. The "court *must* consider ... the general sentencing considerations con-

tained in section 3553(a)" and these include "any pertinent policy statement issued by the Sentencing Commission." *Id.* at 609. There is no reason to place a categorical limitation on *Wyatt* or section 3582(c)(2) that is not compelled by the plain words of the opinion or the statute.

In an effort to justify a categorical limitation, the government urges me to consider *United States v. Jordan,* 162 F.3d 1 (1st Cir.1998), and the guideline commentary found at U.S.S.G. § 1B1.10, application note 2. While I have carefully considered those sources, I am not persuaded that they stand for the proposition urged by the government.

The *Jordan* opinion held that a district court, when resentencing because of Amendment 505, could not consider a "totality of the circumstances" departure that had not been considered at the time of the original sentence. *Jordan,* 162 F.3d at 5–6. The government argues that *Jordan* stands for the proposition that a district court can never depart at an Amendment 505 resentencing when the court has not previously granted a departure motion.

First, I reject the government's reading of *Jordan.* The Court of Appeals was quick to point out that "[w]e decline the government's urging that we broadly adopt a *per se* prohibition...." *Id.* Indeed, in a footnote, the First Circuit cited *Wyatt* for the proposition that the there is "some flexibility in the resentencing." *Id.* at 6 n. 6. Thus, *Jordan* does not stand as a categorical bar to departures at an Amendment 505 resentencing.

Second, *Jordan* is dissimilar to this case. In *Jordan* the defendant failed to make a motion for a "totality of the circumstance" departure at the original sentencing because he believed the law would not permit him to do so. *Id.* at 5. Later, he made such a motion, when Amendment 505 was applied at resentencing, because the law on "totality of circumstances" departures

---

**20.** Note that a substantial assistance departure, like a departure under U.S.S.G. § 5K2.0

(p.s.), is governed by a policy statement. *See* U.S.S.G. § 5K1.1 (p.s.).

had changed in his favor. *Id.* Thus, even though the facts warranting the departure were present at the time of sentencing and could have been considered by the district court, the sentencing court was not asked to consider those matters at the original sentence.

The Court of Appeals reasoned that the defendant could not have obtained resentencing because the law on "totality of circumstances" had changed. Therefore, the Court of Appeals would not allow Jordan to use Amendment 505 to make the change in the "totality of circumstance" law retroactive when that change in the law would not have otherwise been retroactive *Id.* Simply put, the *Jordan* court would not "permit an evasion of the retroactivity doctrine." *Id.*

This case is significantly different. I do not retroactively apply new legal principles regarding departure questions that would not otherwise be retroactive. As a result, I do not disturb "the strong interest in the finality of criminal judgments" that the *Jordan* court rightfully sought to preserve. *Id.* Thus, the dominant concern of the *Jordan* decision is not present here. In contrast, and unlike *Jordan*, I depart in this case based upon facts that arose after the original sentence. These facts could not have been considered at the time of the original sentence because they had not yet arisen. In short, *Jordan* is not on point.

■ As for application note 2 to U.S.S.G. § 1B1.10(c), it does not supports the government's position either. That note tells us that the court "shall substitute only the [retroactive] amendment ... for the corresponding guideline provisions that were applied when the defendant was sentenced" and "[a]ll other guideline application decisions remain unaffected." U.S.S.G. § 1B1.10(c), comment n. 2. Since I do not propose to alter any previous guideline application decisions, I do not violate the spirit or the letter of this commentary by departing based upon post-conviction rehabilitation that took place *after* the original sentencing. *See Wyatt,*

115 F.3d at 608–09 (discussing application note 2 to U.S.S.G. § 1B1.10(c); " 'We have stated that it is implicit in this directive that the district court is leave all of its *previous factual decisions* intact....' ") (quoting *United States v. Adams,* 104 F.3d 1028, 1031 (8th Cir.1997). (Emphasis added.))

In summary, when applying a retroactive guideline amendment, a sentencing court has the statutory authority under section 3582(c)(2) to impose a sentence below the new guideline range so long as: (1) the court does not alter any previous factual decision regarding particularized sentencing issues; and (2) the court departs under U.S.S.G. § 5K2.0 (p.s) or a similar policy statement where, as in the case of post-conviction rehabilitation, the facts and circumstances relevant to the sentencing decision could not have been addressed because they had not yet arisen.

### C. Application of the Second Step

Having clarified when it may be appropriate to impose a sentence below the retroactive guideline amendment sentencing range, I now proceed to apply the second *Wyatt* factor. In other words, while not changing previous factual decisions regarding particularized sentencing questions, but applying the factors set forth in section 3553(a), including "any pertinent policy statement issued by the Sentencing Commission," I decided whether or not to modify the original sentence. *Wyatt,* 115 F.3d at 609.

#### 1. The Sentence Should Be Modified Under the Amendment

Considering all the factors set forth in section 3553(a), it was obvious that the defendant's sentence should have been greatly reduced. I believed at the time I originally sentenced her, and I believe now, that a sentence substantially exceeding 10 to 15 years in prison was inconsistent with the factors set forth in section 3553(a). However, unless I was able to depart without changing the factual decisions I had previously made, I was re-

quired, consistent with the guideline range imposed by the retroactive amendment, to impose a sentence of 324 months on the conspiracy count. Such a sentence would effectively dictate that the defendant spend 27 years in prison. (PSR2d ¶ 97.)

Since the time of the first sentencing, new facts have arisen that were not available to me; that is, the court now has before it the defendant's prison record developed over more than five years following the her first sentence. As I had not previously considered the issue because the relevant facts had not yet arisen, and thus would not run afoul of *Wyatt's* prohibition against altering prior factual decisions, the appropriate question became whether I should depart under U.S.S.G. § 5K2.0 (p.s.) based upon the defendant's subsequent extraordinary rehabilitation efforts in prison. *See, e.g., United States v. Shasky,* 939 F.Supp. 695, 697–700 (D.Neb. 1996) (granting departure to highway patrolman convicted of possessing child pornography due in part to his extraordinary post-offense efforts at rehabilitation). I turn to that question next.

## 2. Extraordinary Efforts at Rehabilitation Warrant Departure

■ Departure questions under U.S.S.G. § 5K2.0 (p.s.) are governed by the analytical framework set out in *Koon. Koon,* 116 S.Ct. at 2045. *Koon* requires a multi-step inquiry.[21] The *Koon* analysis pertinent to whether extraordinary efforts a rehabilitation justify a departure can be summarized as follows: (1) the court must first decide whether extraordinary efforts at rehabilitation potentially take the case outside the "heartland"; (2) next, the court decides whether the Commission has forbidden a departure based upon that factor; (3) if so, a departure is not justified; (4) if not, the court decides whether the Commission has encouraged departures based upon extraordinary efforts at rehabilitation; (5) if so, the court may depart based

upon the encouraged factor; (6) if not, the court decides whether the Commission has discouraged departures based upon that feature or has otherwise considered it in another guideline; (7) if so, the court should decide whether the factor is present to an exceptional degree or in some other way the factor makes the case different from the ordinary case where the factor is present. *Id.*

Initially, the defendant's rehabilitation efforts during the more than five years she has spent in prison potentially take this case outside the "heartland." The Commission has not prohibited departures based upon extraordinary post-offense rehabilitation. On the contrary, although not encouraged, extraordinary post-offense rehabilitation efforts have been held to justify departures. *See, e.g., United States v. Kapitzke,* 130 F.3d 820, 823–24 (8th Cir.1997) (departure for extraordinary post-offense rehabilitation efforts in child pornography case was not an abuse of discretion). *See also United States v. Simpson,* 7 F.3d 813, 819 (8th Cir.1993) (recognizing that post-offense rehabilitative efforts, while normally not grounds for departure, may support departure in "extraordinary circumstances").

In fact, the courts have concluded that extraordinary post-offense efforts at rehabilitation which take place after sentencing and while in prison may warrant a departure upon resentencing. *See, e.g., United States v. Green,* 152 F.3d 1202, 1207–09 (9th Cir.1998) (upon resentencing district court could consider extraordinary efforts at rehabilitation; holding that, in a drug case, the district court provided a reasonable explanation for its 11–level downward departure for extraordinary efforts at rehabilitation); *United States v. Rhodes,* 145 F.3d 1375, 1381 (D.C.Cir.1998) (reversing and remanding for the district court to decide whether the defendant, who was to be resentenced for a drug offense, was

**21.** The adoption of this process did not make new law. *Id.* (citing *United States v. Rivera,* 994 F.2d 942, 949 (1st Cir.1993)).

entitled to a departure because he had taken every opportunity to improve himself during the prior six and a half years in prison; stating: "We know of no reason why sentencing courts' broad mandate under sections 3553(a) and 3661 to sentence defendants as they stand before the court—whether after plea bargaining, trial or appeal—should exclude consideration of post-conviction rehabilitation"); *United States v. Core*, 125 F.3d 74, 75 (2nd Cir. 1997) *cert. denied* — U.S. —, 118 S.Ct. 735, 139 L.Ed.2d 672 (1998) (reversing district court's refusal to depart upon resentencing in a drug case; stating: "We find nothing in the pertinent statutes or the Sentencing Guidelines that prevents a sentencing judge from considering postconviction rehabilitation in prison as a basis for departure if resentencing becomes necessary"); *United States v. Sally*, 116 F.3d 76, 80 (3rd Cir.1997) (reversing and remanding district court's refusal to grant departure in a drug case upon resentencing; "We hold that post-offense rehabilitation efforts, including those which occur *post-conviction*, may constitute a sufficient factor warranting a downward departure provided that the efforts are so exceptional as to remove the particular case from the heartland in which the acceptance of responsibility guideline was intended to apply.") (Emphasis in original.)

■ However, while the guidelines do not discourage departures for extraordinary efforts at rehabilitation, run-of-the-mill rehabilitative efforts are considered when deciding whether to award an acceptance of responsibility reduction. *See* U.S.S.G. § 3E1.1, comment (n. 1(g)). Consequently, the courts have stressed that rehabilitative efforts must be extraordinary to warrant a departure. *See, e.g., Core*, 125 F.3d at 78 ("Defendants who accomplish a successful rehabilitation go far beyond what is required to qualify for the deduction under § 3E1.1.")

I have not previously awarded the defendant a reduction for acceptance of responsibility because she was not entitled to that reduction when I first sentenced her.

As I read *Wyatt*, I cannot alter my prior decision that the defendant was not eligible for an acceptance of responsibility reduction. Consequently, I must continue to deny her a reduction for acceptance of responsibility.

Nevertheless, it is not inconsistent to deny the defendant a reduction for acceptance of responsibility because of her actions in 1993, but also conclude that, during the following five years in prison, the defendant subsequently engaged in extraordinary efforts at rehabilitation justifying a departure in 1999 for those efforts. Such an important, previously unknown and unreviewed change in circumstance is precisely why the *Rhodes* court stated that there was no justification for ignoring post-conviction rehabilitation "whether after plea bargaining, *trial or appeal.*" *Rhodes*, 145 F.3d at 1381 (emphasis added). Normally, of course, a defendant who elects to go to trial in order to contest factual guilt will forfeit a reduction for acceptance of responsibility. *See* U.S.S.G. § 3E1.1 comment (n. 2.) Thus, the acknowledgment in *Rhodes* that a trial will not necessarily prohibit a departure for subsequent extraordinary rehabilitation efforts proves the proposition that it is not inconsistent to deny a reduction for acceptance of responsibility while granting a motion for departure based upon subsequent extraordinary efforts at rehabilitation.

■ Having decided that post-conviction efforts at rehabilitation may justify a departure if they are extraordinary even when the defendant is not entitled to a reduction for acceptance of responsibility, the question became whether the defendant's efforts were, in fact, extraordinary. In order to be extraordinary the defendant must demonstrate and the court must find that "the defendant has achieved real gains in rehabilitating himself and changing his behavior." *Sally*, 116 F.3d at 82. As noted earlier, these gains must "go far beyond what is required to qualify for the

deduction under § 3E1.1." *Core*, 125 F.3d at 78.

When attempting to decide whether a defendant's post-conviction efforts at rehabilitation are extraordinary, it is helpful to examine what other courts have considered extraordinary. For example, in *Green*, where the court departed downward 11 levels in a drug case, that departure decision was found not to be an abuse of discretion. *Green*, 152 F.3d at 1209. In that case, Green had spent several years under the supervision of the court while on probation before he was resentenced. At resentencing, the district court stressed that it had received a glowing letter from a group with which the defendant had provided community service. The letter reflected that the defendant had helped needy youth and had gone "above and beyond" in doing so. The defendant also stressed that he had greatly benefited from his good works.

Although the government insisted that Green had only done what he was required to do, the Court of Appeals felt otherwise. The Court of Appeals stressed that, while it was true that Green had been compliant, not everyone "achieves rehabilitation, let alone extraordinary rehabilitation." *Id.* at 1208. The facts in Green were sufficient for the Court of Appeals to conclude that: "We find no abuse of discretion in the district court's determination in the instant case that Green's rehabilitation was 'highly successful' in kind or degree or 'exceptional.'" *Id.*

■ With the foregoing principles in mind, I found and concluded that Ms. Hasan has made remarkable post-conviction efforts at rehabilitation, that those efforts have been largely successful, and those efforts, both in kind and degree, are extraordinary. Ms. Hasan's case is truly outside the heartland and warrants a departure.

In order to evaluate the significance of Ms. Hasan's efforts, we should remember the context. Ms. Hasan went to prison as young, poorly educated, pregnant mother of two children who had not worked for over four years. She gave birth to her third child in prison. She was bitter, and distrusting. She wrongly gave her religion as an excuse for rejecting responsibility for her actions. Although she had no criminal history, she faced life in prison. I cannot imagine a more bleak and hopeless picture for rehabilitation.

Despite her dismal prospects, we now have a record of more than five years of a sustained commitment to employment, vocational education, personal growth, and religious and cultural study. In addition, we have an unequivocal expression of shame for her criminal conduct. For example, the defendant has consistently worked and presently holds a responsible position as the payroll clerk for over 260 inmates. She has completed more than 180 hours of vocational education classes such as word processing and accounting. She has taken numerous classes to assist her in parenting and related life-skills. She attends 12–step drug abuse programs. She studies Arabic. She takes classes to better understand her Islamic faith. She is a hard working volunteer for her religion. Both in her testimony before Judge Piester and in her letter to the court, she has admitted culpability for the drug conspiracy and she has expressed shame for her conduct, including her remarks at sentencing.

From a variety of prison officials come glowing descriptions of the defendant and her rehabilitative efforts. These descriptions include: "a record of clear conduct, outstanding ... a blessing," a "fine model among her peers," "always ready to help," a "competent and reliable worker," willing to perform tasks "unrelated to her assigned duties ... cheerfully and without hesitation," uses her idle time "to better herself by learning new skills," and "markedly improved the atmosphere of the business office."

In a letter of commendation to the defendant's case worker, the Reverend Ronald Richter, the religious supervisor for the prison, observed that over the last five

years, "I have personally witnessed her spiritual growth and maturity." He concludes that: "Ms. Hasan will be a valuable asset to her family and the community upon release." Likewise, Ms. Hasan's counselor, who has supervised her since 1994, states that she has made "exceptional efforts towards self-improvement." The counselor also believes that "[u]pon her release from incarceration she will be a productive member of society."

In summary, I am persuaded that the defendant has proven that her efforts at rehabilitation warrant a departure. Her performance in prison has been extraordinary.

### 3. Extent of Departure

█ I decided that a departure to total offense level 33 was appropriate. Keeping in mind the defendant's zero criminal history score, this would mean that the guideline imprisonment range on the most serious offense of conviction was between 135 to 168 months in prison. U.S.S.G. *Guidelines Manual*, Ch. 5, Pt. A., Sentencing Table (1998). I then decided that 12 years (144 months) in prison would be an appropriate sentence.

Briefly, the following reasons informed my decision about the proper extent of the departure. First, this decision amounts to a departure of 8 levels. The *Green* court, confronted with a first offender in a drug case with no criminal history, departed 11 levels where the post-conviction efforts at rehabilitation were extraordinary. *Green*, 152 F.3d at 1209. Although the *Green* case is not perfectly analogous because Green's crime was far less serious than the defendant's, the opinion nevertheless establishes that a 8 level departure is not unreasonable. Second, the defendant is substantially less culpable than Tracy Lomax, the organizer of the conspiracy, who received a life sentence. For example, Lomax, who directed every facet of the conspiracy from "cooking" the crack to selling it, received a weapons enhancement and a criminal history category score of IV. *McMurray*, 833 F.Supp. at 1458.

Third, the defendant is more culpable than Oscar McMurray, who received a 120–month departure sentence due to his diminished capacity.[22] *McMurray*, 34 F.3d at 1409. Even though McMurray's criminal history category score was II and he received a weapons enhancement, his role was a minor one compared to the defendant's role. *McMurray*, 833 F.Supp. at 1458–59 (description of McMurray's enhancement and criminal history), 1473 (description of McMurray's role), 1485 (description of defendant's role). Fourth, the extent of the proposed departure is consistent with the government's plea offer to Ms. Hasan. The proposed departure will thus produce a sentence that the government, at one time, thought was just.

## III. CONCLUSION

The law sensibly permits a judge to consider post-conviction rehabilitation when resentencing a defendant. While the preference for finality of criminal judgments may properly bar the assertion, of arguments that might have been asserted earlier, it makes no sense to preclude a sentencing judge from considering facts pertinent to resentencing that had not yet arisen at the time of the original sentence. Sometimes that examination will help a defendant, as it has done here, and other times it will not. Whatever the result for the defendant, the task of the judge should be to select a sentence consistent with the goals set forth by Congress in sections 3582(c)(2) and 3553(a). Ignoring facts arising after the original sentence which are clearly important to resentencing is no way to faithfully adhere to the statutory mandate.

---

**22.** Because of the mandatory minimum, I could not depart below 10 years.